# SPRINGFIELD TOBACCO REDRYERS CORPORATION v. CITY OF SPRINGFIELD, TENNESSEE.—
## 293 S. W. (2d) 189.

Middle Section. Nashville, May 18, 1956.

Petition for Certiorari denied by Supreme Court, September 3, 1956.

Wilson Sims and Cecil Sims, Nashville, for complainant.

Charles Willett, Springfield, for defendant.

FELTS, J. This suit was brought by the Springfield Tobacco Redryers Corporation against the City of Springfield, Tennessee, to recover damages for an alleged breach of contract by defendant to purchase complainant's real estate and plant, pursuant to our statute, Ch. 137, Acts 1951, T. C. A. sec. 6-1701 et seq., known as ''The Industrial Building Revenue Bond Act of 1951.' ''

 This Act is designed to aid in bringing industries to our cities. It enables a city to purchase and improve industrial property; to pay therefor by issuance and sale of revenue bonds, provided their issuance is voted by three-fourths of the voters; and to lease

such property to an industrial concern, the bonds to be secured by the property and the rentals, and to be amortized and paid off over a stated period. This is a valid enactment. Holly v. City of Elizabethton, 193 Tenn. 46, 241 S. W. (2d) 1001.

The bill alleged that, pursuant to this Act, defendant made a written contract, dated March 12, 1952, to purchase complainant's land and plant and to pay $175,000 cash for it; and that this promise was upon two contingencies: (1) that the issuance of the bonds should be approved by the voters, and (2) that defendant should lease the property to a named concern, these provisions of the contract (Ex. A to O. B.) being as follows:

"It is within the contemplation of the parties that the Purchaser is to execute revenue bonds of Springfield, Tennessee, secured only by an incumbrance upon said property and the rental thereof; and from the sale of said revenue bonds to purchase said land at $175,000.00 and to make certain improvements thereon and lease said property to the Wilson Athletic Goods Manufacturing Company, Inc., at such a rental as will pay off and discharge said revenue bonds which will be amortized over a period of twenty-five (25) years. It is agreed and understood by all of the parties that the issuance of said revenue bonds is to be voted upon in a referendum by the lawful voters of Springfield, Tennessee, as provided by law and that in the event that the issuance of said bonds does not receive the majority provided for by law then this contract is to be of no further force or effect.

"It is further agreed and understood between the parties hereto that the Purchaser desires to acquire said property for the sole purpose of leasing the same to Wilson Athletic Goods Manufacturing Company, Inc., and that said revenue bonds for the purchase of said land are not to be issued unless the Purchaser is able to effect a lease with Wilson Athletic Goods Manufacturing Company, Inc., at a rental sufficient to pay the interest and principal on said revenue bonds and retire the same in full over a period of 25 years. *If for any reason said lease contract is not entered into, then this contract shall be of no further force or effect.*" (Italics ours.)

The bill further alleged that these two conditions had both been fulfilled; that the requisite majority of the voters of Springfield had voted for the issuance of the bonds; and that defendant had entered into a lease contract with the Wilson Athletic Goods Manufacturing Company, Inc. (hereinafter called Wilson); but that notwithstanding the fulfillment of these conditions defendant breached its contract by refusing to complete the purchase of the property.

It was further averred that upon such breach complainant filed a bill for declaratory judgment and specific performance; but that defendant still persisted in its breach; that while that suit was pending defendant desired to acquire the property to lease to another concern and offered $110,000 for it; and that complainant, solely in order to mitigate its damages, dismissed the suit without prejudice and sold the property to defendant for $110,000, thereby reducing its damage to the liquidated sum of $65,000 plus interest, etc., for which it sought recovery.

Defendant in its answer admitted it made the contract (Ex. A) and averred these matters in avoidance: (1) that complainant had no corporate existence on March 12, 1952, because its charter had been revoked for being delinquent in its taxes; (2) that its stockholders and directors had not authorized a sale of its property; (3) that defendant's promise to purchase the property was upon condition that it could lease the same to Wilson, that Wilson refused to lease it, and the contract was of "no further force or effect"; and (4) that complainant, by its subsequent sale of the property to defendant for $110,000, waived its rights under the first contract (Ex. A), and that contract was merged with the later one.

The cause was heard before the Chancellor upon the pleadings and proofs by depositions. There was no material conflict in the evidence. It showed without dispute that the bond issue had been approved by the voters, the vote being 1,134 for to only 3 against it; and that defendant and Wilson had entered into a contract (Ex. B to O. B.) for a lease, and had agreed on the terms of the lease, reduced it to writing (Ex. C to O. B.), had not signed it, but had attached it to and made it a part of the contract they did sign (Ex. B).

The Chancellor filed an opinion embracing his findings of fact and conclusions of law. He pointed out there was no dispute as to material facts, and he was of opinion that if complainant was entitled to any recovery, "the amount of such recovery would be the difference between said sum of $175,000.00, fixed as the purchase price of said property in said contract of March 12, 1952, and the sum of $110,000.00, fixed as the purchase price of the same property in said contract of June 16, 1953, or the sum of $65,000.00, and interest thereon".

He held, however, that complainant was not entitled to any recovery. He rested this conclusion upon two grounds: (1) that defendant's obligation under the contract (Ex. A) to purchase the property was upon condition that Wilson should execute the lease, which it declined to do, the condition failed, and the contract (Ex. A) was of "no further force or effect"; and (2) that if the contract could be regarded as binding, complainant waived its rights thereunder by its subsequent sale of the same property to defendant for $110,000, and the earlier contract was superseded by and merged into the later one. He accordingly dismissed complainant's bill.

Complainant appealed and has assigned errors. The first questions debated by learned counsel relate to the part of the contract (Ex. A), above quoted, as to defendant leasing the property to Wilson; what was the intent and meaning of this condition; whether it required that Wilson sign the lease (Ex. C) after they had made it a part of the contract (Ex. B) they had signed; or whether it merely required that they enter into a contract legally binding Wilson under the lease as part of such contract.

This depends on the intention of the parties, which is to be gathered from the words used in their contract, read in the light of their negotiations, the circumstances of the making of the contract, and the practical construction of it by the parties themselves. Southern Pub. Ass'n v. Clements Paper Co., 139 Tenn. 429, 201 S. W. 745, L. R. A. 1918D, 580; Neilson & Kittle Canning Co. v. F. G. Lowe & Co., 149 Tenn. 561, 260 S. W. 142; Fidelity-Phenix Fire Ins. Co. of New York v. Jackson, 181 Tenn. 453, 181 S. W. (2d) 625.

This property, two and one-half acres of land with a large plant thereon, lies just outside the corporate limits of the City of Springfield, and was owned by complainant, a Tennessee corporation. Wilson was a Delaware corporation, with its principal office and place of business in Chicago, Illinois. It was said to be one of the world's largest manufacturers of athletic equipment, with factories in many cities. In October 1951, its representative, Mr. Gage, came to Springfield, talked to Mr. Wagner, complainant's General Manager, and looked at the property.

Early in 1952, Gage came back, expressed an interest in acquiring the property. Wagner asked $200,000 for it. Gage said: "I have been authorized by my company to offer you $175,000.00". Wagner agreed to accept this offer. Gage suggested that the property be purchased for Wilson by the City of Springfield under the "Municipal Bond Act". Wagner stated he was not familiar with the Act, and Mr. John R. Long, Mayor of Springfield, was called into a conference and discussed the matter with them.

Wilson's engineers came, inspected the property, asked for, and were given, a copy of the blueprints showing the construction of the building. The engineers made plans and specifications for remodeling the building for Wilson. It was agreed that defendant, City of Springfield, would proceed under the Industrial Revenue Bond Act, call an election on the issuance of bonds not to exceed $400,000, purchase the property for $175,000, pay the costs of remodeling it for Wilson, and lease it to Wilson for 25 years at such a rental as would pay off the bonds in that time.

The work of preparing the contracts was done by Mr. Gage, representing Wilson, and Mr. John R. Long, Mayor of Springfield, and Mr. George W. Yost, City Attorney of Springfield, the two latter eminent members of the Springfield Bar, representing Springfield. As it was uncertain, or not known beforehand, whether the voters of Springfield would vote for the issuance of the bonds, Mr. Gage suggested that the contract between defendant and complainant be put in the form of a mere option to defendant to purchase the property.

Mr. Wagner was called to the City Hall and asked if complainant would agree to give defendant an option to purchase the property. He refused to do that, and said that complainant would not agree to anything but a *"firm contract"*. It was then agreed that defendant would enter into a presently binding contract to purchase complainant's property, subject to the two conditions— the voting of the bonds and the leasing of the property to Wilson.

And the contract (Ex. A) was so made, as we have seen, expressing these conditions in the excerpts above quoted. It also stated that concurrently with its execution defendant and Wilson were entering into a contract that if the bonds were voted defendant would acquire the property, make the improvements required by Wilson, and lease it to Wilson; and that a copy of the contract for a lease (Ex. B) and a copy of the lease agreed on but not signed was attached to and made a part of the contract (Ex. A) between complainant and defendant.

These three documents were prepared at the same time. As before stated, this work was done by Mr. Gage, Mr. Long, and Mr. Yost; but the contract between defendant and Wilson for a lease (Ex. B) was drawn by Mr. Long,

and the lease (Ex. C) was prepared by Mr. Gage. This contract (Ex. B), by its terms, was presently binding upon both defendant and Wilson upon the conditions therein stated; and this lease (Ex. C) contained the terms and conditions governing Wilson's tenancy for the 25-year term.

This contract (Ex. B) was conditional—conditioned upon the bond issue being approved by the voters, but the lease was unconditional and absolute, setting forth in some 20 odd paragraphs the "terms, conditions and covenants" of Wilson's tenancy for 25 years. This lease was a formal document to be put of record not only for the parties but for the holders of the bonds, which were to be secured by the property and the rentals. All of its terms were spelled out except blanks for the date and for the amount of monthly rent. We quote from the lease:

"To Have And To Hold unto the Company [Wilson] for use and occupation for lawful business purposes and not otherwise for and during the term of twenty-five (25) years, from the ———day of —————————, 1952, to and including the ———day of —————————, 1977.

"In Consideration Whereof, the Company agrees to pay to the City, at the office of the City Clerk in said City of Springfield, on the first day of each month of said term, in advance, as rent for said premises herein leased, the sum of ——————— Dollars (—————), per month."

The parties had agreed on the means for filling these blanks with the date and the amount. The 25-year term would begin when the remodeling was done; and the amount of the monthly rent would be computed at such

amount as would pay the interest and principal on the bonds in 25 years, the amount of the bonds being $175,000, the purchase price of the property, plus the costs of remodeling, which costs were within the control of Wilson, and were known or ascertainable by it.

So the parties agreed on this lease (Ex. C) and made it a part of their contract (Ex. B). This contract recited in its preamble that defendant had agreed to proceed under this Act, Ch. 137, Acts 1951, to purchase complainant's property for $175,000, to lease it to Wilson; and then the contract stipulated:

"Now, Therefore, This Agreement, made and entered into on this the 12th day of March 1952, by and between Springfield, Tennessee, hereinafter referred to as City, and Wilson Athletic Goods Manufacturing Company, Inc., hereinafter referred to as Company, Witnesseth:"

The contract then states the obligations of the City to proceed under the Act, to purchase complainant's property (describing it), to have the remodeling done by contract according to the plans (15 sheets) of Wilson and under its supervision, etc.; and then the contract provides:

"Upon the performance by City of the above obligations and agreements and upon approval and acceptance by Company of the date, the term, insurance coverage and amount of monthly rental, both Company and City agree to execute and acknowledge for registration a lease agreement between the parties to this agreement, *a copy of which lease is attached hereto and made a part of this contract*" (Italics ours.)

After defendant had signed its contract (Ex. A) to purchase complainant's property, it signed the above contract (Ex. B) for the lease to Wilson, and then the contract (Ex. B) and the lease (Ex. C) were sent to Wilson in Chicago and were approved by its Board of Directors, and the contract (Ex. B) was signed by Wilson by its President, F. J. Bowman, and attested by its Assistant Secretary, E. C. Offstedal. Wilson made, and initialed, a slight modification in paragraph 11 of the lease, as shown by its letter of March 14, 1952, to Mr. Long, Mayor, enclosing this lease. We quote the first two paragraphs of the letter:

"Enclosed, *executed* by Wilson Athletic Goods Mfg. Co., Inc., is the City's original counterpart of the agreement.

"Paragraph 11 seemed to need a little dressing up to make more clear the intention. 'As owner of the demised premises' has been inserted in second line; and the right to defend has been added as the last sentence. An extra *executed* copy is enclosed upon which, for the record, will you please add your initials in two places at the margin of Paragraph 11 and return this one to me. Thank you". (Italics ours.)

This letter also stated that Wilson had notified its engineers "to start lining things up". Wilson sent some "copy" upon which defendant made an announcement in a local newspaper on March 20, 1952, under this large heading: "Wilson Company Contracts for Sports Factory Here", and it was stated that defendant and Wilson had made an agreement by which this property would be used by Wilson as a factory, and the lease would

amortize the bonds over a period of 25 years. At the same time a referendum on the bonds was called for April 11, 1952.

On the faith of this public announcement, authorized by Wilson and made by defendant, the voters of Springfield voted practically unanimously for the bond issue. Wilson had the insurance on the building increased to $190,000. One of its engineers moved into the building, contacting contractors bidding on the work of remodeling. Bids were received, publicly opened, and the Jamison Construction Company of Memphis was the low bidder. Wilson agreed to look after the sale of the bonds.

Then there was a period of delay, during which complainant was pressing defendant to proceed and defendant was passing the pressure on to Wilson. On May 16, 1952, Gage wrote Mayor Long that the costs of remodeling were more than had been expected and that there had been a "misunderstanding" as to the foundation, piers, and the roof of the building. But in the concluding paragraph Gage said: "However, there is no need for apprehension on the part of the City respecting our plans".

On May 19, 1952, Mayor Long wrote Gage stating that he appreciated Gage's letter of May 16th, "as it will take some of the pressure off of me, in that I have some explanation of the delay which we are experiencing in getting the plant renovation under way". Mayor Long also reminded Gage that Wilson's engineers had the blueprints showing the construction of the building and that there could have been no misrepresentation or misunderstanding.

About June 1, 1952, Mr. Yost, City Attorney, happened to be in Chicago on other business and called on Gage at his office. Gage said Wilson was considering not taking the property, and that there had been misrepresentations or a misunderstanding about the footing of piers and about the roof of the building. Mr. Gage also told Mr. Yost that he thought defendant's contract with complainant was "in the nature of an option".

Mayor Long and Gage had a number of long distance telephone conversations and on June 8, 1952, Mayor Long went to Chicago and had a conference with Wilson's representatives, Mr. Gage and Judge Cooney. Gage again insisted there had been certain misrepresentations or a misunderstanding in regard to the underpinning and the roof of the building. There was, however, no proof to support such an insistence. The Chancellor so found, and we concur.

In these conferences Wilson's representatives, Mr. Gage and Judge Cooney, told Mayor Long that Wilson did not wish to go on with its contract to take the property. In reply, Mayor Long said: "I explained that in a town of this size we expected people to go ahead with their contracts". Gage then suggested that defendant's contract with complainant contained an "escape clause" —the provision that if for any reason defendant did not enter into a lease contract with Wilson, then its contract with complainant would be of no further force and effect.

In these conversations, Mr. Gage and Judge Cooney made a proposal alternative to their contract. Instead of going on with the contract and taking complainant's property, they proposed to acquire other adjacent property, the Murphey land, a tract of 22.4 acres. Wilson

had already said it was interested in this additional acreage, and Mayor Long had already investigated and found it could be purchased. Defendant agreed to this alternative proposal and agreed to act as undisclosed agent in purchasing this other property for Wilson.

Mayor Long got back to Springfield June 11, 1952, and on the same day Wilson wrote him a letter, a copy of which was given complainant, outlining Wilson's reasons for not taking complainant's property. On June 17, 1952, defendant got an offer from the Murpheys to sell the land for $12,500, telephoned Wilson, Wilson wired the money, and defendant took a deed conveying the property to itself without disclosing that the conveyance was for the use and benefit of Wilson and upon consideration paid by Wilson.

Under this alternative proposal, it was understood that Wilson and defendant would abandon their existing contracts (Ex. A, B & C) for complainant's property and make new ones for the other property; that Wilson would reimburse defendant for the expenses it had incurred under those contracts; and that the money Wilson furnished to purchase the other property "would be returned by the City to Wilson after the bonds were issued under the Bond Act of Tennessee".

At the same time defendant notified complainant that Wilson "refused to make said lease" of complainant's property, and that defendant's contract (Ex. A) to purchase the property "was, therefore, of no further force and effect" (Ans. R. P. 30).

Such were the circumstances under which the contract (Ex. A) was made and in the light of which it is to be interpreted. As we have seen, complainant refused to

agree to an option or to anything but a "firm contract"; and defendant entered into a contract presently binding it to purchase the property (1) if the bonds were voted and (2) if it could enter into a lease contract of the property to Wilson at a rental sufficient to pay the bonds.

It is admitted that condition (1) was met—that the bonds were voted; and the remaining question is whether condition (2) was fulfilled so as to make defendant's promise unconditional and absolute and to put upon it the duty of immediate performance. The paragraph containing this condition has been quoted above. We think it may be fairly paraphrased as follows:

"[It is agreed that defendant desires to acquire the property for the sole purpose of leasing it to Wilson and that the bonds for the purchase of it] are not to be issued unless the Purchaser is able to effect a lease with [Wilson] at a rental sufficient to pay the interest and principal on [the bonds and retire them in 25 years]. *If for any reason said lease contract is not entered into, then this contract shall be of no further force or effect*". (Italics ours.)

Learned counsel for defendant contends that the above words "said lease contract" refer to *"a lease"* to Wilson and not a mere contract to lease to Wilson; and that this condition was not fulfilled by the making of a contract to lease, but required the execution of the lease itself by Wilson; and as this was not done, the condition failed, and the contract was of no further force or effect. This was the view of the Chancellor.

With deference to the learned Chancellor and to counsel, we think that the words "said lease contract" should be construed to mean a contract for a lease to

Wilson for a term and at a rental sufficient to pay the interest and principal on the bonds and retire them in 25 years; but it is immaterial which construction be given these words; whether this condition required Wilson to sign the lease (Ex. C), or was satisfied by the making of the contract (Ex. B) for a lease.

It is undisputed that defendant and Wilson did enter into a contract (Ex. B) for a lease of the property to Wilson for a term of 25 years at a rental sufficient to pay the interest and principal on the bonds and retire them in that time. They also agreed on the lease itself (Ex. C), attached a copy of it to and made it "part of *this* contract" (Ex. B) (italics ours). It is also undisputed that this contract (Ex. B), with the lease (Ex. C) as a part of it, was duly signed by defendant and by Wilson, was valid and binding on both of them, and was legally enforceable by either against the other.

As we have seen, Wilson in its letter of March 14, 1952, enclosed to defendant "an *executed*" copy of this lease (Ex. C), with a slight modification in paragraph 11, which Wilson initialed, and requested defendant to initial on the extra copy of the lease to be returned to Wilson. The legal effect of this was the same as the signing of the lease itself, since the " 'signature may be in an abbreviated form, as by the use of initials' ". Gessler v. Winton, 24 Tenn. App. 411, 421, 145 S. W. (2d) 789, 795.

It seems quite clear that when defendant and Wilson entered into their contract (Ex. B) for a lease, agreed on the lease itself (Ex. C), attached it to and made it a part of their contract, the legal effect was the same as the execution of the lease itself. The signing of the contract, embracing both the contract for a lease and the lease itself, was the same as the signing of the lease.

■ It is not necessary that the contract be contained in a single document. Any number of papers may be taken together to make out the written expression of the contract of the parties, provided there is sufficient connection between the papers. ''This connection may be established either by physical attachment of different papers at the time of the signature, or by reference'' (2 Williston on Contracts (1936), section 580). 1 Restatement, Contracts, section 208; Yates v. Skaggs, 187 Tenn. 149, 154, 213 S. W. (2d) 41, 43.

So, the conclusion seems inescapable that this condition as to leasing the property to Wilson was satisfied by what the parties did, whether the condition be construed as requiring Wilson to sign the lease itself or as merely requiring that they enter into a contract for a lease to Wilson; for, in legal effect, they did both of these things.

■ When the two conditions of defendant's promise to purchase complainant's property were fulfilled, the promise became unconditional and absolute and defendant was under the duty of immediate performance. All the parties so construed the matter, and understood it was a completed and binding contract, and were going forward in carrying it out until Wilson changed its mind. '' ' ''The interpretation given by the parties themselves to the contract as shown by their acts will be adopted by the Court'' ' ''. Womble v. Walker, 181 Tenn. 246, 181 S. W. (2d) 5, 7.

It is urged, as a defense for defendant, that it ''did not desire to institute and wage a difficult and doubtful lawsuit against'' Wilson, in order to enforce performance by Wilson of its part under its contract (Ex. B & C) with defendant; and that defendant's contract (Ex. A)

with complainant did not impose any duty on defendant to bring suit against Wilson to enforce Wilson's performance.

■ We think this was no defense or excuse. Defendant's promise to complainant was conditioned upon defendant and Wilson *entering into a lease contract,* not upon Wilson's performance of that contract. When they entered into such a contract, defendant's obligation to complainant became absolute, and defendant could not avoid or evade that obligation by refusing to enforce Wilson's performance under its contract. Parker v. Walker, 86 Tenn. 566, 8 S. W. 391; City of Del Rio v. Ulen Contracting Corp., 5 Cir., 94 F. (2d) 701, 705.

Furthermore, defendant had Wilson's legal obligation to take the property and pay therefor a rental sufficient to pay off the bonds and leave the property still belonging to defendant; and defendant could have enforced this obligation. Instead, it actively aided Wilson in disregarding this obligation and in proceeding under the alternative proposal. Having done this, defendant, we think, is in no position to urge Wilson's non-performance as any defense or excuse for itself. It would seem to come within the principle stated by Professor Williston:

"It is a principle of fundamental justice that if a promisor is himself the cause of the failure of performance, either of an obligation due him or of a condition upon which his own liability depends, he cannot take advantage of the failure" 3 Williston on Contracts (1936 ed.), section 677.

As we have seen, one of the defenses set up in defendant's answer was that complainant's stockholders and directors had not authorized a sale of its land and plant.

The proof, however, showed there was such an authorization, a resolution to that effect being put in the record. Another defense was that complainant had no corporate existence or power to contract on March 12, 1952, when the contract (Ex. A) was made.

It is well settled under our statutes and decisions that where a party enters into a contract with a purported corporation, he thereby admits its corporate existence, and is afterwards estopped to deny it; and that only the State can raise the question of corporate existence. T. C. A. Secs. 40-110, 48-711. Ingle System Co. v. Norris & Hall, 132 Tenn. 472, 178 S. W. 1113, 5 A. L. R. 1578; Reed v. Appleby, 150 Tenn. 63, 69, 262 S. W. 35, 36; Eastern Products Corp. v. Tennessee Coal, Iron & R. Co., 151 Tenn. 239, 261, 262, 269 S. W. 4, 10, 12, 40 A. L. R. 1483.

This brings us to the last matter pleaded by defendant as a defense to this suit for damages for a breach of its contract. As we have seen, that was a plea in confession and avoidance that complainant had voluntarily waived and abandoned its right to damages for defendant's breach of its contract (Ex. A); that complainant, by its subsequent sale of the property to defendant for $110,000, gave up and waived its rights under the first contract, and that contract was superseded by, and merged in, the later one.

This being an affirmative defense, the burden was on defendant to prove it. 1 Gibson's Suits in Chancery (5th ed.) section 451. In order " 'to make out a case of abandonment or waiver of a legal right, there must be a clear, unequivocal and decisive act of the party, showing such a purpose, or acts amounting to an estoppel' ".

Koontz v. Fleming, 17 Tenn. App. 1, 9, 65 S. W. (2d) 821, 825, and cases there cited.

"Or, as stated in Masson v. Anderson, (3 Baxt. [290, 304]), 62 Tenn. [290] 304, 'abandonment or waiver of a right important to parties cannot be made out by uncertain implication, but ought clearly to appear. To constitute such a waiver of a benefit, there must be a clear, unequivocal, and decisive act of the party, an act which shows a determination not to have the benefit intended.' " Koontz v. Fleming, supra.

Also to the same effect: Gentry v. Gentry, 33 Tenn. 87, 60 Am. Dec. 137; Prewitt v. Bunch, 101 Tenn. 723, 742, 50 S. W. 748; Baird v. Fidelity-Phenix Fire Ins. Co., 178 Tenn. 653, 162 S. W. (2d) 384, 140 A. L. R. 1226.

After defendant breached its contract with complainant by refusing to complete its purchase, and while the former suit was pending, and complainant was trying to sell the property for the best price possible, defendant desired to acquire it to lease it to the American Snuff Company and offered $110,000 for it. Wagner testified that, in order to minimize the damages, as he was advised he was bound to do, complainant accepted this offer, and sold and conveyed the property to defendant for $110,000, or $65,000 less than it had contracted to pay for it.

Mayor Long testified that he was not told that complainant was making the subsequent sale to defendant to minimize its damages, and that he would not have agreed to it if he had been told. But as Mayor he signed the contract which provided that the pending suit was to be dismissed according to the terms of a decree, which

provided that the suit was "dismissed *without preju-dice*". And defendant's answer contains this admission:

"It is true that counsel for the Complainant before said sale was consummated informed counsel for the Defendant, and wanted him to understand, that another suit would be filed against this Defendant under Exhibit A to the original bill".

Neither the subsequent contract nor the deed thereunder made any reference to the first contract (Ex. A). There was no evidence of any intent of the parties to make a compromise settlement or an accord and satisfaction, or a surrender or waiver of any of the rights or claims under the earlier contract. So we think defendant failed to make out this defense.

It affirmatively appears that complainant did not intend to waive any of its rights under the first contract. The parties stipulated that the former suit should be, and it was, "dismissed *without prejudice*"; and counsel for complainant notified counsel for defendant that "another suit would be filed against this defendant under Exhibit A to the original bill". Defendant was bound to know that the only purpose of another suit under that contract would be for damages for breach of it.

It is insisted for defendant that this case comes within the rule that a subsequent contract between the same parties touching the same subject matter and containing terms wholly inconsistent with the former contract, will generally be held to supersede the former contract; and American Fruit Growers v. Hawkinson, 21 Tenn. App. 127, 106 S. W. (2d) 564, 565, as cited as authority for that rule.

That case recognized that rule but held that the subsequent contract there involved did not supersede the former contract because such subsequent contract was not supported by any consideration and the Court quoted approvingly from Williston on Contracts as follows:

" 'But the subsequent agreement must have sufficient consideration. Therefore if the undertaking by one party is simply to perform the whole or part of what he promised in the original contract, it will not support a promise by the other party to perform a promise by the other party to perform what he had previously agreed and something more. Nor (what is substantially the same thing) can an existing contract be altered by mutual assent by an agreement merely to give one party a right or privilege, or subject the other party to a burden which he did not have previously.' 3 Williston on Contracts, 3145, 3146, sec. 1826 [now 6 Williston on Contracts (1936 ed.) section 1826, page 5173]."

Defendant was bound under the earlier contract to pay $175,000 for complainant's property. Under the later contract it got the property for only a part of that consideration, only $110,000, or $65,000 less than the promised price under the earlier contract. Under the authority of the Hawkinson case and other like cases there was no consideration to support the later contract, and no basis for holding that the earlier contract was superseded by or merged in the later one.

In Arkansas & Texas Grain Co. v. Young & Fresch Grain Co., 79 Ark. 603, 96 S. W. 142, 143, 116 Am. St. Rep. 99, the buyer of a car of grain wrongfully refused, upon inspection, to accept it and the seller resold the grain to

the buyer at a price less than the contract price, and sued the buyer to recover damages for his breach of the contract, and was allowed to recover the difference between the price promised in the first contract and the price paid under the second. In that case the Court said:

"Neither did the fact that the agent of [plaintiff] came down to Texarkana and resold the corn to defendant amount in itself to a waiver of that right. It was his duty to obtain the best price possible, and, as the best offer came from defendant, plaintiff did right in accepting the offer. The circumstances in proof justified the circuit court in finding that there was no waiver by plaintiff of the original contract, nor of its right to seek damages for breach of the contract." (Citing cases.)

While that was a case of personal property, we think the same principle applies to the case before us. Upon defendant's breach of its contract complainant was entitled to recover the difference between the promised price and the value of the land, which value, we think, was established, as between complainant and defendant, by the subsequent sale. What a thing is sold for is evidence of its value. Equitable Life Assur. Soc. of United States v. Ellis, 16 Tenn. App. 551, 560, 65 S. W. (2d) 250.

As we have seen, the learned Chancellor held that if complainant was entitled to recover, the amount of such recovery was the difference between $175,000, the price promised in the first contract, and $110,000, the price in the second contract, or $65,000 plus interest. We think this is the correct measure of recovery. Complainant is entitled to recover $65,000 with interest thereon.

See, Tennessee Fertilizer Co. v. International Agr. Corp., 146 Tenn. 451, 473, 243 S. W. 81.

The. decree of the Chancery Court is reversed and a decree will be entered in this Court for complainant, Springfield Tobacco Redryers Corporation, against defendant, the City of Springfield, Tennessee, for the sum of $65,000 with interest thereon from October 5, 1953, the date of the filing of the bill therein, to the date of the entry of this decree, together with the costs of the cause.

Hickerson and Shriver, JJ., concur.