IN THE COURT OF APPEALS OF TENNESSEE,
AT JACKSON

FILED

November 18, 1998

Gibson County Chancery Court

Cecil Crowson, Jr.
Appellate Court Clerk

|  |  |  |
|---|---|---|
| JENKINS SUBWAY, INC. and ROSE JENKINS, | ) ) ) | Gibson County Chancery Court No. 12925 |
| Plaintiffs/Appellants. | ) ) | |
| VS. | ) ) | C.A. No. 02A01-9801-CH-00001 |
| LYNN JONES, | ) ) | |
| Defendant/Appellee. | ) ) | |

From the Chancery Court of Gibson County at Trenton.
**Honorable George R. Ellis, Chancellor**

**Douglas W. Wilkerson**,
**W. Lewis Jenkins, Jr.**,
WILKERSON GAULDIN & HAYES, Dyersburg, Tennessee
Attorneys for Plaintiffs/Appellants.

**William R. O'Bryan, Jr.**,
**C. Dale Allen**,
**Ryan A. Kurtz**,
TRABUE, STURDIVANT & DEWITT, Nashville, Tennessee
Attorneys for Defendant/Appellee.

OPINION FILED:

**REVERSED AND REMANDED**

**FARMER, J.**

**CRAWFORD, P.J., W.S.**: (Concurs)
**HIGHERS, J.**: (Concurs)

Plaintiffs Jenkins Subway, Inc., and Rose Jenkins appeal the trial court's final judgment dismissing their claims for breach of contract and breach of fiduciary duty against Defendant/Appellee Lynn Jones. The trial court's judgment in favor of Jones was based primarily on the court's ruling that, even if the subject contracts survived the December 1993 death of Rose Jenkins' husband, Ed Jenkins, Rose Jenkins and Jenkins Subway effectively waived or were estopped from asserting their rights under the contracts. We conclude that this ruling was in error, and, thus, we reverse the trial court's judgment and remand for further proceedings.

## I. Factual and Procedural History

In November 1991 Ed Jenkins and Lynn Jones entered into an agreement for the acquisition and management of a Subway sandwich shop franchise located in the Lynnwood shopping center in Jackson, Tennessee. In the event their franchise application was successful, the agreement required Ed Jenkins to finance the acquisition of the franchise's assets and the operation of the franchise by guaranteeing and furnishing the collateral for a $160,000 note. The $160,000 note represented the $150,000 purchase price for the assets plus $10,000 in working capital for the franchise. In exchange, Jones agreed to attend any training sessions required by the Subway franchisor and to manage the franchise's business. Following their acquisition of the franchise and assets, the agreement required the parties to transfer the assets to a newly-formed corporation. The agreement gave Jones the right to serve as an officer and director in the corporation. Under the terms of the agreement, all of the corporate stock initially would be owned by Ed Jenkins. Once the $160,000 note was paid in full and Ed Jenkins was released from his guaranty, the agreement required him to transfer twenty-five percent (25%) of the corporation's stock to Jones. In the event that Jones ceased to manage the Subway franchise prior to the note being paid, Jones would forfeit any interest in the corporation's stock and assets.

In accordance with the 1991 agreement, Ed Jenkins formed a new corporation called Jenkins Subway, Inc. Thereafter, the Lynnwood Subway franchise's assets were transferred to the corporation, and Lynn Jones became the corporation's vice president. In 1992, Ed Jenkins and Jones acquired another Subway franchise in Camden, Tennessee. Because Ed Jenkins contemplated the acquisition of additional franchises, Ed Jenkins and Lynn Jones executed a second agreement in

August 1993. The 1993 agreement recited that Subway had changed its requirements for franchisees by requiring that all named franchisees attend Subway's training school. Inasmuch as Ed Jenkins did not wish to attend the training school, and inasmuch as Jones had attended and successfully completed the training school, the parties agreed that any franchises acquired by Ed Jenkins after the date of the agreement would be acquired in the name of Jones, although the funding for same would be provided by Ed Jenkins. To this end, the 1993 agreement provided that:

1. From and after the effective date of this Agreement and for so long as Subway requires its franchisees to attend its training school, any franchises acquired by Jenkins shall be in the name of Jones. Although the franchise will show Jones as the franchisee, it is the understanding and agreement of the parties that Jenkins shall be the real party in interest, and Jones shall if requested by Jenkins execute such documents as may be necessary to vest ownership of said franchise in Jenkins.

2. If at a future time the Corporation may be the franchisee of the franchises acquired in the name of Jones from and after the date of this Agreement, then Jones shall execute such documents as may be necessary to transfer said franchises to Corporation.

3. Jones agrees to continue to manage the various Subway franchises owned by Jenkins, including those acquired in Jones' name subsequent to the execution of this Agreement, under and pursuant to that Agreement between the parties dated the [17th] day of November, 1991, under which, among other things, Jones will acquire twenty-five percent (25%) of the stock of Corporation upon the repayment of those obligations made or guaranteed by Jenkins.

This Agreement shall be binding upon the parties, their heirs and assigns.

In accordance with their 1993 agreement, Ed Jenkins and Lynn Jones acquired two additional Subway franchises, one in McKenzie, Tennessee, and another in Huntingdon, Tennessee. In December 1993, however, Ed Jenkins died unexpectedly. Ed Jenkins' widow, Plaintiff Rose Jenkins, inherited his assets, including his Subway franchises and all of the stock of Jenkins Subway, Inc.

In early 1994, Lynn Jones was offered the opportunity to participate in a partnership which would own and operate a new Subway franchise located in the Jackson-Madison County General Hospital. Jones already knew the other partners, who included Mark and Nancy Bradford and Cheri Childress, because they also owned Subway franchises in various cities. Initially, the other

partners merely offered Jones two percent (2%) of the new franchise's profits.[1] Jones responded by stating that, out of respect for Ed Jenkins, he believed he should discuss the proposal with Rose Jenkins. When they subsequently discussed the proposal, Rose Jenkins asked Jones if they should get more than the two percent offered, and she indicated that they should "look into it" further.

After further negotiations, the Bradfords and Cheri Childress proposed that they form a partnership with Lynn Jones to own and operate the hospital Subway franchise. The Bradfords and Childress proposed that Jones would own fifty percent (50%) of the new partnership, but they made clear that they did not want Rose Jenkins to be a partner because they did not know her. After Jones discussed this proposal with Rose Jenkins, she agreed that Jones should participate in the hospital Subway franchise as a 50% partner. Jones suggested that, if the hospital Subway franchise was profitable, at some future date he might be able to reduce his salary from Jenkins Subway and instead support himself with the income from the hospital Subway franchise. Jones and Rose Jenkins agreed that such an arrangement would be beneficial for Jenkins Subway.

In July 1994 Lynn Jones and the other partners signed an agreement whereby they formed a partnership called Health Ventures. The stated purpose of the partnership was to acquire, develop, and operate a Subway franchised facility in space to be leased from the Jackson-Madison County General Hospital. Paragraph 9.1 of the partnership agreement prohibited any of the partners from assigning, selling, transferring, hypothecating, conveying, mortgaging, or otherwise encumbering "his or her respective interest in the Partnership without the prior express consent of the other Partners."

Lynn Jones' participation in the partnership required an initial investment of almost $30,000, including $1250 for the franchise fee, $1700 for the first month's rent, and $25,000 for operational expenses. As Ed Jenkins had done in acquiring past Subway franchises, Rose Jenkins provided the investment funds by obtaining a $30,000 loan from Volunteer Bank. As collateral for the loan, Rose Jenkins pledged 1500 shares of Wal-Mart stock.

---

[1]Apparently, the franchisor wanted the Bradfords and Childress to involve the franchisee of the Lynnwood Subway because the proposed hospital Subway was less than two miles from the Lynnwood location.

The hospital Subway store opened in October 1994. The new franchise quickly became so profitable that, by the end of March 1995, Health Ventures had earned enough income to repay most of Rose Jenkins' $30,000 loan from Volunteer Bank. Around May 1995, Lynn Jones began reducing the salary he received from Jenkins Subway. In lieu of his salary, Jones began receiving income from the hospital Subway franchise's profits. By 1996, Jones no longer was drawing any salary from Jenkins Subway. During this time, Jones provided Rose Jenkins with monthly balance sheets and income statements for Health Ventures' hospital Subway franchise; however, Health Ventures did not pay any income to Rose Jenkins other than the funds used to repay her loan with Volunteer Bank.

Although the sequence of events is not entirely clear, the relationship between the parties quickly deteriorated in the spring of 1996. The last balance sheet and income statement Rose Jenkins received from Lynn Jones were dated April 30, 1996. In May 1996, Rose Jenkins hired Travis Davidson, a certified public accountant, to assume control of Jenkins Subway's financial affairs because the corporation was losing money and she was dissatisfied with Jones' explanation for the corporation's losses. Rose Jenkins did not inform Jones that she had hired Travis Davidson until after the fact.

During the spring of 1996, Rose Jenkins also asked her attorney, Collins Bonds, to draft a memorandum of understanding for Lynn Jones' signature acknowledging Jenkins Subway's interest in the Health Ventures partnership. As drafted, the memorandum of understanding required Jones to acknowledge (1) that Jenkins Subway furnished the funding for the initial capital contribution made by Jones to the Health Ventures partnership, (2) that Jenkins Subway was the true owner of Jones' 50% interest in the partnership, (3) that Jones held his interest in the partnership in trust for the corporation, (4) that Jones' interest in the partnership was a corporate asset, and (5) that the parties reaffirmed their previous agreements made in November 1991 and August 1993.

When Lynn Jones was presented with the memorandum of understanding during a June 1996 meeting in Collins Bonds' office, he refused to sign the document. Later that month, Jones resigned from Jenkins Subway, Inc., effective July 31, 1996. This lawsuit followed in which each party claimed ownership of the 50% interest in the Health Ventures partnership.

The complaint filed by Rose Jenkins and Jenkins Subway in November 1996 asserted claims against Lynn Jones for breach of contract (Counts I and II) and breach of fiduciary duty (Count III). The complaint sought an accounting from Jones of the benefits received from the hospital Subway franchise, a return of the benefits received by Jones, damages, and other relief. Jones filed an answer in which he asserted the defense of promissory estoppel, as well as a counterclaim for the salary that he allegedly deferred in reliance on Rose Jenkins' agreement to his participation in the Health Ventures partnership.

At trial, Rose Jenkins testified that, when she provided the initial funds for Lynn Jones to invest in the Health Ventures partnership, she understood that she was the one who actually was acquiring the 50% interest in the partnership and that Jones merely was holding his interest for the benefit of her and Jenkins Subway. Jenkins explained that she borrowed $30,000 from Volunteer Bank and invested it in the Health Ventures partnership because "I was to be the partner. Silent. I guess you would call it a silent partner." Jenkins further explained that she never questioned the fact that her name did not appear on the partnership agreement because she knew that, never having attended the Subway training school, she was ineligible to be a franchisee. According to Jenkins, the first time Jones ever claimed ownership of the hospital Subway franchise was during the June 1996 meeting in her attorney's office. Jenkins testified that, prior to this confrontation, she did not feel the need to tell Jones that either she or Jenkins Subway owned the 50% interest in the hospital Subway franchise because "[i]t was [her] understanding from the beginning that that was the way it was." Jenkins believed that the 1991 and 1993 agreements gave Jenkins Subway (and her as the corporation's sole shareholder) an ownership interest in the hospital Subway franchise. Despite this belief, in June 1996 she presented Jones with the memorandum of understanding drafted by her attorney because she felt "that [she] needed some protection" and that she "needed something in writing" similar to the 1991 and 1993 agreements.

Lynn Jones similarly testified that Rose Jenkins failed to claim any ownership interest in the Health Ventures partnership or the hospital Subway franchise prior to the parties' June 1996 meeting. In explaining his version of the transaction, Jones testified that he discussed the initial partnership negotiations with Jenkins because he thought "she was going to have some involvement in it with me." Jones testified that he later informed Jenkins that the other partners wanted him as

a partner but that they did not want to be partners with Jenkins or Jenkins Subway. Jones stated that Jenkins agreed to his involvement in the Health Ventures partnership after he informed her that, if the hospital Subway franchise became profitable at some point in the future, Jones might be able to reduce his salary from Jenkins Subway and instead draw his income from Health Venture's profits from the hospital Subway franchise.

Lynn Jones offered several explanations as to why Rose Jenkins provided the initial funding for his interest in the hospital Subway franchise and Health Ventures. Jones first testified that

> Basically, it was the way we had done business in the past. You know, I had options; I could have went to another option. Mr. Sims [the bank president], we talked about, you know, he was trying to get the Bradfords' business. He wanted to see if we could get it all together in one loan.

> He said, "We also could look at if you need the money, we could look at trying to develop something on your own, or we could do as we've done in the past," is basically, if I remember, what he said.

> And I told him, I said, "Well, Ms. Rose is going to have some involvement in this thing with me, so I just as soon go ahead and do it as we've done it in the past." Been doing banking in the banking business since I was 15 years old and I really didn't want to change. So it was just the way we had been doing things. I felt comfortable with dealing with Elton [Sims] and that bank.

Jones later testified that he approached Jenkins for the Health Ventures financing

> Because I felt so bad about all of the money we had gone through and lost over the years; and also out of respect for [Ed] Jenkins, because he got me into the businesses. I wanted her to have some type involvement in this venture.

When asked why Rose Jenkins would invest over $25,000 in a partnership in which she owned no interest, Jones explained:

> Because she knew she was going to be involved in it, even though she couldn't be a partner; she was going to have involvement in it.

Lynn Jones also had difficulty explaining why he provided Rose Jenkins with Health Ventures' monthly financial statements if Jenkins owned no interest in the partnership. Jones gave the following testimony:

> Because I felt like she was involved. Because she needed to see how much money that I would be taking out of the hospital account. I felt like she needed to be kept up to date.
>
> . . . .
>
> Again, I go back to the point that my salary had been reduced, and I wanted her to be able to keep up with how much I was receiving out of the Health Ventures store. And that would be the only reason I know of to do it, and let her stay abreast of what I was doing.

Jones was unable to explain why Jenkins would ask questions about Health Ventures' financial statements if she had no ownership interest in the hospital Subway franchise.

Although Lynn Jones repeatedly testified that he wanted Rose Jenkins to have some type of "involvement" in the hospital Subway franchise, his testimony as to the nature of such involvement was inconsistent. Jones admitted stating in a prior deposition that he did not believe either he or Jenkins was "entitled to the whole 50 percent" of the partnership. In his trial testimony, Jones agreed that Jenkins was entitled to receive "some kind of benefits" and that she probably was "entitled to receive a percentage of the ongoing cash flow out of that store." Jones later retreated from this position, however, and insisted that Jenkins' involvement in the hospital Subway franchise should be limited to the benefit she already had received as a result of Jones' reduction in salary from Jenkins Subway.

Lynn Jones conceded that, under the 1991 and 1993 agreements, if Ed Jenkins still were alive, he would be the beneficial owner of Jones' interest in the Health Ventures partnership. Jones believed, however, that the 1991 and 1993 agreements terminated upon the December 1993 death of Ed Jenkins and, thus, did not apply to the acquisition of his interest in the hospital Subway franchise. Jones admitted stating in his prior deposition that he believed the agreement was binding on the parties' heirs and assigns, but at trial Jones insisted that he believed the agreements bound

only him and Ed Jenkins and, further, that the agreements applied only to existing franchises and not to franchises acquired in the future.

At the trial's conclusion, the trial court entered a judgment in favor of Lynn Jones which dismissed the claims of Rose Jenkins and Jenkins Subway and dismissed Jones' counterclaim. In support of its judgment, the trial court ruled that, even if the subject agreements survived the December 1993 death of Ed Jenkins, the agreements did not apply to the acquisition of Jones' interest in the Health Ventures partnership and the hospital Subway franchise for at least three reasons: (1) neither Ed Jenkins nor Rose Jenkins had any involvement in the acquisition of Jones' interest in the hospital Subway franchise; (2) Rose Jenkins and Jenkins Subway waived their rights under the agreements or were estopped from asserting such rights; and (3) Lynn Jones' performance of the agreements was excused as a legal impossibility because the Health Ventures partnership agreement prohibited Jones from assigning his interest in the partnership and because the rules of the Subway franchisor prohibited a corporation, such as Jenkins Subway, from being a franchisee.

On appeal, Rose Jenkins and Jenkins Subway have presented the following issues for this court's review:

I.      Whether the agreements between Ed Jenkins and Lynn Jones, dated November 17, 1991, and August 12, 1993, terminated at the death of Ed Jenkins.

II.     If the November 17, 1991, and August 12, 1993, agreements did not terminate at the death of Ed Jenkins, whether Lynn Jones breached those agreements by claiming sole ownership of an interest in the Subway shop in the Jackson-Madison County General Hospital.

III.    Whether Lynn Jones breached his fiduciary duty as an officer of Jenkins Subway, Inc.

IV.     Whether Rose Jenkins took any action or failed to take any action that reasonably allowed Lynn Jones to believe that neither [Rose] Jenkins nor Jenkins Subway, Inc. made a claim to the interest in the Subway shop in the Jackson-Madison County Hospital; in other words, whether [Rose] Jenkins' actions or inactions acted as an estoppel on her claim or the claim of Jenkins Subway, Inc. to an interest in the Subway shop in the Jackson-Madison County General Hospital.

V.      Whether the trial court erred in refusing to acknowledge Lynn

Jones' admission that Rose Jenkins owns a part of the interest in Health Ventures that bears Lynn Jones' name, so that even if the 1991 and 1993 contracts fail to apply and Jones did not breach his fiduciary duty to Jenkins Subway, Inc., a joint venture existed between Rose Jenkins and Lynn Jones in relation to the Subway store in the Jackson-Madison County General Hospital.

## II.  Survival of the 1991 and 1993 Agreements

This appeal first requires us to determine whether the subject agreements survived Ed Jenkins' death.  As noted by the trial court, the subject agreements were personal service contracts.  As a general rule, "[c]ontracts to perform personal acts are considered as made on the implied condition that the party shall be alive and capable of performing the contract, so that death or disability, including sickness, will operate as a discharge, termination of the contract, or excuse for nonperformance."  17A C.J.S. *Contracts* § 465, at 623 (1963); *accord Edelen Transfer & Storage Co. v. Willis*, 66 S.W.2d 214, 216 (Tenn. App. 1932).  In discussing the rationale for this rule, our supreme court has explained that, as a general proposition,

> upon the death of one of the contracting parties to a personal service contract this voids the contract because it is impossible for the performing party, he being dead, to complete his services that he agreed to. . . .
>
> "Where distinctly personal services, requiring peculiar skill, are to be rendered by each of the contracting parties as inducements to the contract, the death of either of the parties is the death of the contract."

*Rodgers v. Southern Newspapers, Inc.*, 379 S.W.2d 797, 799 (Tenn. 1964) (quoting 12 Am. Jur. *Contracts* § 375, at 951); *see, e.g.*, *Presley v. City of Memphis*, 769 S.W.2d 221, 223 (Tenn. App. 1988) (indicating that contract to see Elvis Presley concert performance, as represented by concert ticket, was void because performance of concert became impossible when Presley died).

This rule does not apply, however, "where the acts called for by the contract are of such a character that they may be as well performed by others," such as "the promisor's personal representatives."  17A C.J.S. *Contracts* § 465, at 626-27 (1963); *accord Rodgers*, 379 S.W.2d at

799. Where the contract with the deceased is executory, "and the personal representative can fairly and fully execute it as well as the deceased himself could have done, he may do so, and enforce the contract." *Edelen Transfer & Storage*, 66 S.W.2d at 216 (quoting *Cox v. Martin*, 21 So. 611, 612 (Miss. 1897)). The foregoing rule also does not apply "where the contract by its terms shows that performance by others was contemplated" or where the agreement provides "for its continuance after the death of one of the parties." 17A C.J.S. *Contracts* § 465, at 627-28 (1963); *see also Rodgers*, 379 S.W.2d at 799 (citing *Howard v. Adams*, 105 P.2d 971, 974 (Cal. 1940)). Moreover, "[t]he death of a party does not excuse nonperformance of a contract which embodies a property right which passes to personal representatives of [the] deceased." 17 C.J.S. *Contracts* § 465, at 627.

The issue of whether a particular contract survives the death of one of the parties implicates questions of law because, in order to resolve this issue, the court must construe the parties' contract. *See Edelen Transfer & Storage*, 66 S.W.2d at 216; *see also Rodgers*, 379 S.W.2d at 799. Applying the foregoing authorities to the contracts at issue in this case, we conclude that the subject contracts did not terminate upon the December 1993 death of Ed Jenkins. The 1993 agreement, which provided that Lynn Jones would continue to manage any present or future Subway franchises in accordance with the 1991 agreement, specifically provided that the agreement would apply to future franchise acquisitions and that the agreement would be binding upon the parties' "heirs and assigns." As this court recently stated, where a contract binds the parties' "heirs and assigns," such a provision "surely indicates an intent that the contract rights will survive the death of one of the parties." *Williamson County Broad. Co. v. InterMedia Partners*, No. 01A01-9709-CH-00480, 1998 WL 467108, at *3 (Tenn. App. Aug. 12, 1998) (citing *Teague v. Sowder*, 114 S.W. 484 (Tenn. 1908)). Furthermore, these agreements embodied certain property rights which passed to Rose Jenkins upon the death of Ed Jenkins. After Ed Jenkins' death, Rose Jenkins acquired his Subway franchises. Jenkins Subway also continued to exist as a corporate entity after Ed Jenkins' death, and Rose Jenkins became its sole shareholder. In the event it became possible for a corporation to be a Subway franchisee,[2] the agreements required Lynn Jones to transfer any future franchises acquired in his name to Jenkins Subway. Accordingly, under the terms of the agreements, Jones assumed certain obligations to Jenkins Subway and not just to Ed Jenkins.

---

[2]By the time of trial, the franchisor had changed its rules to permit corporations to be franchisees.

Moreover, contrary to Lynn Jones' argument on appeal, the agreements did not require Ed Jenkins to perform personal services requiring any peculiar skill. Rather, as described by the agreements, Ed Jenkins' sole responsibility was to provide the financing for the acquisition of the Subway franchises and franchise assets. This function just as easily could have been performed by Rose Jenkins, and, in fact, it was Rose Jenkins to whom Jones turned to finance the acquisition of the hospital Subway franchise. When the Bradfords and Cheri Childress initially approached Jones, his response was to consult with Rose Jenkins and to relay their proposals to her. When asked why Rose Jenkins obtained the loan from Volunteer Bank and then transmitted the funds to the Health Ventures partnership, Jones acknowledged that this method of financing was the way he and Ed Jenkins "had done business in the past." In sum, we conclude that the agreements' provisions and Jones' own testimony establish that the subject agreements survived the death of Ed Jenkins.

### III. Waiver and Estoppel

We also conclude that the evidence preponderates against the trial court's finding that Rose Jenkins and Jenkins Subway waived their rights under the contracts or that they somehow were estopped from asserting their rights thereunder. The courts of this state repeatedly have held that, in order to constitute an abandonment or waiver of a legal right,

> "there must be a clear, unequivocal, and decisive act of the party showing such a purpose, or acts amounting to an estoppel on his part." *Ross v. Swan*, 7 Lea, 468. Or, as stated in *Masson v. Anderson*, 3 Baxt. 304: "Abandonment or waiver of a right important to parties cannot be made out by uncertain implication, but ought clearly to appear. To constitute such a waiver of a benefit there must be clear, unequivocal, and decisive acts of the party, an act which shows a determination not to have the benefit intended."

*Charleston, S.C., Mining & Mfg. Co. v. American Agric. Chem. Co.*, 150 S.W. 1143, 1146 (Tenn. 1911); *accord Springfield Tobacco Redryers Corp. v. City of Springfield*, 293 S.W.2d 189, 198 (Tenn. App. 1956); *Koontz v. Fleming*, 65 S.W.2d 821, 825 (Tenn. App. 1933); *see also Stovall of Chattanooga, Inc. v. Cunningham*, 890 S.W.2d 442, 444 (Tenn. App. 1994); *Trice v. Hewgley*, 381 S.W.2d 589, 595 (Tenn. App. 1964); *Webb v. Board of Trustees of Webb School*, 271 S.W.2d 6,

19 (Tenn. App. 1954). The law will not presume a waiver, and the party claiming the waiver has the burden of proving it by a preponderance of the evidence. *Koontz*, 65 S.W.2d at 825; *see also Springfield Tobacco Redryers*, 293 S.W.2d at 198 (indicating that defendant has burden of proving affirmative defense of waiver). Waiver may be proved by "express declaration; or by acts and declarations manifesting an intent and purpose not to claim the supposed advantage; or by a course of acts and conduct, or by so neglecting and failing to act, as to induce a belief that it was [the party's] intention and purpose to waive." *Baird v. Fidelity-Phenix Fire Ins. Co.*, 162 S.W.2d 384, 389 (Tenn. 1942) (quoting *Farlow v. Ellis*, 81 Mass. 229, 231 (1860)). In order to establish waiver by conduct, the proof must show some "absolute action or inaction inconsistent with the claim or right" waived. *Koontz*, 65 S.W.2d at 825; *accord Stovall*, 890 S.W.2d at 444; *Webb*, 271 S.W.2d at 19.

As with the defense of waiver, the burden of establishing an estoppel also rests upon the party who invokes it. *Third Nat'l Bank v. Capitol Records, Inc.*, 445 S.W.2d 471, 476 (Tenn. App. 1969). The courts have recognized a distinction between the concepts of waiver and estoppel:

> A waiver is an intentional relinquishment of a known right. An estoppel *** can be maintained only on the ground that, by the fault of one party, another has been induced *** to change his position for the worse in such a manner that it would operate as a virtual fraud upon him to allow the party by whom he has been misled to assert the right in controversy.

*Baird v. Fidelity-Phenix Fire Ins. Co.*, 162 S.W.2d 384, 388 (Tenn. 1942) (quoting *Shaw v. Spencer*, 100 Mass. 382, 395 (1868)); *accord Burge Ice Mach. Co. v. Strother*, 273 S.W.2d 479, 483 (Tenn. 1954); *Gitter v. Tennessee Farmers Mut. Ins. Co.*, 450 S.W.2d 780, 784 (Tenn. App. 1969); *Shelby Mut. Ins. Co. v. Wilson*, 383 S.W.2d 791, 801 (Tenn. App. 1964); *Webb v. Board of Trustees of Webb School*, 271 S.W.2d 6, 19 (Tenn. App. 1954). Stated another way, "[a] waiver is an intentional relinquishment, while the indispensable elements of an estoppel are ignorance of the party who invokes the estoppel, a representation by the party estopped which misleads, and an innocent and deleterious change of position in reliance on that representation." *Webb*, 271 S.W.2d at 19 (quoting 56 Am. Jur. *Waiver*, at 104). In order to establish an estoppel, also known as an "implied waiver" or "waiver by estoppel," the party asserting it must show that he prejudicially

changed his position in reliance upon the other party's conduct. *Gitter*, 450 S.W.2d at 785.

After reviewing the record in this case, we conclude that the evidence preponderates against the trial court's findings of waiver and estoppel on the part of Rose Jenkins and Jenkins Subway. Specifically, the record fails to contain any evidence of "clear, unequivocal, and decisive" acts by Jenkins which would manifest an intent and purpose not to claim Lynn Jones' interest in the hospital Subway franchise. On appeal, Jones claims that Jenkins manifested such an intent by agreeing to Jones' participation in the hospital Subway franchise and by failing to object to the partnership agreement which made Jones a 50% partner in Health Ventures.

We conclude that this argument is without merit. Although the undisputed evidence showed that Rose Jenkins agreed to Lynn Jones' participation in the hospital Subway franchise, Jones failed to present any evidence that, in doing so, Jenkins intended to relinquish any rights inuring to her or Jenkins Subway under the 1991 and 1993 agreements. Regarding his participation in the Health Ventures partnership, Jones testified that:

> I went back to [Rose Jenkins] and told her they offered to -- or we were going to look at doing a 50/50 type partnership. And Ms. Rose said, "Can we get 51 percent?"
>
> "Ms. Rose, I don't know. This is what they offered, a 50/50 partnership." I said, "You need to understand that they're not going to go in partners with you. They're not going to go in partners with the corporation. That's not what they're asking for."
>
> That they would be willing to go in with partners on me for 50 percent.

The problem with Jones' testimony is that it in no way contradicted the rights conferred on Jenkins and Jenkins Subway by the 1991 and 1993 agreements. The agreements specifically contemplated that any future Subway franchises acquired by Ed Jenkins would be in Jones' name but that Ed Jenkins would be the real party in interest. In accordance with Ed Jenkins' obligations under the agreements, Rose Jenkins provided all of the funding for Jones' acquisition of his portion of the hospital Subway franchise. The fact that Jones' name appeared on the Health Ventures partnership agreement did not conflict with the provisions of the 1991 and 1993 agreements, which indicated that Jones' name would appear on any Subway franchises acquired with Ed Jenkins' funds. Under

the express terms of the agreements, therefore, the fact that Jones acquired the hospital Subway franchise in his name alone did not contradict Rose Jenkins' and Jenkins Subway's claims to be the real parties in interest.

As for Rose Jenkins' agreement to Lynn Jones' participation in the Health Ventures partnership and the hospital Subway franchise, Jones further testified that:

> We did talk about it would be a beneficiary [sic] for Jenkins Subway, because the cash flow was so bad at that time, and anything we could do -- and I told her, well, if the hospital becomes profitable, and at some point in time it is profitable, maybe I could reduce my salary down and take my salary out of -- or my profits, salary, or whatever the monies that come from the hospital, that I can receive monies from that and continue living or continue to make my living that way, which would in turn reduce the cash flow coming out of the Jenkins Subway.
>
> . . . .
>
> . . . Outside of that, we never got to any specific agreements.

This testimony demonstrated that Jones and Jenkins discussed the possible benefits of Jones' participation and Jenkins' investment in the hospital Subway franchise. Contrary to Jones' argument on appeal, however, this testimony did not indicate that Jenkins agreed to give up any ownership interest in the hospital Subway franchise in exchange for certain promised benefits.

We also conclude that the evidence fails to support Lynn Jones' assertion that Rose Jenkins misled him into changing his position for the worse. In support of his estoppel theory, Jones argues that Jenkins induced him to change his position by acquiescing in or ratifying Jones' participation in the hospital Subway franchise. Jones' testimony, however, failed to demonstrate how any representations or conduct on the part of Jenkins induced him to detrimentally change his position. If anything, the testimony suggested that it was Jones who presented the hospital Subway opportunity to Jenkins for her consideration, that it was Jones who induced Jenkins to fund the initial investment of almost $30,000, and that it was Jones who later voluntarily reduced his salary from Jenkins Subway in an effort to help Jenkins and Jenkins Subway.[3]  Singularly absent from the

_____

[3]Jones also points to the fact that Jenkins did not report any income from the Health Ventures partnership on either her personal or corporate tax returns for 1994 and 1995.  Jones did

transcript is any testimony that Jones ever communicated to Jenkins his belief that his participation in the hospital Subway franchise would not be governed by the 1991 and 1993 agreements. In fact, Jones' understanding that the 1991 and 1993 agreements did not apply to his acquisition of the hospital Subway franchise appeared to be based, not upon any discussions between the parties, but upon Jones' subjective belief that the agreements did not survive the death of Ed Jenkins.

## IV. Impossibility of Performance

Finally, we reject Lynn Jones' contention that his performance of the 1991 and 1993 agreements was rendered impossible by the terms of the Health Ventures partnership agreement and the rules of the Subway franchisor. A party is not relieved of liability for his nonperformance of a contract based upon the defense of impossibility of performance where the impossibility is caused by the party's own conduct or where the impossibility is caused by developments which the party could have "prevented or avoided or remedied by appropriate corrective measures." *United Brake Sys., Inc. v. American Envtl. Protection, Inc.*, 963 S.W.2d 749, 756-57 (Tenn. App. 1997); *accord Tucker v. Hundley*, 452 S.W.2d 658, 660 (Tenn. App. 1969). Specifically, the defense of impossibility of performance is not available where the impossibility is caused by the defaulting party's assumption "of obligations with respect to the subject-matter of the contract that are wholly inconsistent" with performance of the contract. *Brady v. Oliver*, 147 S.W. 1135, 1139 (Tenn. 1911). In the present case, Jones knowingly executed a partnership agreement and acquired a Subway franchise the provisions of which effectively prohibited participation by Rose Jenkins and Jenkins Subway. Having chosen this course of action, Jones cannot now claim that his performance of the 1991 and 1993 agreements thereby was rendered impossible.

## V. Constructive Trust

In light of our conclusion that, pursuant to the 1991 and 1993 agreements, Rose Jenkins and Jenkins Subway were the beneficial owners of Lynn Jones' interest in the hospital Subway franchise, we further conclude that the trial court should have granted their request to

not testify, however, that he in any way relied on this fact or that he even was aware of it.

impose a constructive trust against Jones for the profits he earned from his interest in the franchise. A constructive trust arises against one who, "in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy." *Sanders v. Forcum-Lannom, Inc.*, 475 S.W.2d 172, 174 (Tenn. 1972); *accord Rowlett v. Guthrie*, 867 S.W.2d 732, 734 (Tenn. App. 1993); *Livesay v. Keaton*, 611 S.W.2d 581, 584 (Tenn. App. 1980). Under this remedy, for example, a corporate officer who improperly uses corporate assets for personal gain must account to the corporation for any profits made by the use of such assets. *Central Bus Lines, Inc. v. Hamilton Nat'l Bank*, 239 S.W.2d 583, 585 (Tenn. App. 1951). Similarly, an employee who wrongfully appropriates his employer's property for his own use holds the property and its proceeds in constructive trust for the employer. *Preston v. Moore*, 180 S.W. 320, 322 (Tenn. 1915). In the present case, Jones improperly claimed sole ownership of property which he had acquired for the benefit of Rose Jenkins and Jenkins Subway. This property consisted of 50% of the partnership which owned and operated the hospital Subway franchise. Moreover, Jones received substantial profits from his use of this property. Under these circumstances, we hold that Jenkins and Jenkins Subway are entitled to a constructive trust against Jones for his share of the partnership profits of Health Ventures.

### VI. Conclusion

We reverse the trial court's judgment in favor of Lynn Jones and remand for the imposition of a constructive trust in favor of Jenkins Subway and Rose Jenkins and for other proceedings consistent with this opinion. Our reversal is without prejudice to Jones' right to raise the issue of any offset he may be due for the salary he earned prior to his resignation from Jenkins Subway. In light of our resolution of this appeal, we pretermit any remaining issues not discussed in the foregoing opinion. Costs of this appeal are taxed to Jones, for which execution may issue if necessary.

_____
FARMER, J.

_____
CRAWFORD, P.J., W.S. (Concurs)

HIGHERS, J. (Concurs)