# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### March 23, 2011 Session

## CRYE-LEIKE, INC. v. SARAH A. CARVER

**Direct Appeal from the Chancery Court for Shelby County**
**No. CH-08-0122-2    Arnold B. Goldin, Chancellor**

---

**No. W2010-01601-COA-R3-CV  - Filed May 26, 2011**

---

This is a dispute over a real estate sales commission.  The seller entered into a six-month exclusive listing agreement with a realty company.  The agreement expired on August 21, 2007, one day before the eventual purchasers were shown the property.  The realty company filed suit to recover a commission asserting it caused the property to be shown to the purchasers prior to August 21 and, in the alternative, the parties orally and through their actions extended the listing agreement to August 30, 2007.  The trial court concluded the realty company was not entitled to a commission under the plain language of the listing agreement because the property was not shown or submitted to the purchasers prior to August 21 and the parties did not extend the agreement to August 30.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; and Remanded**

DAVID R. FARMER, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, J., joined.  HOLLY M. KIRBY, J., filed a concurring opinion.

Brittan Webb Robinson and Roger A. Stone, Memphis, Tennessee, for the appellant, Crye-Leike, Inc.

Kenneth Raymond Besser and Al H. Thomas, Memphis, Tennessee, for the appellee, Sarah A. Carver.

## OPINION

### I.  Background and Procedural History

In February 2007, the defendant/appellee, Sarah Carver, contacted associate real estate broker Stanley Mills about the possibility of selling her home at 9010 Gandy Cove in

Memphis, Tennessee (the "Property"). As a result, Ms. Carver entered into an "Exclusive Right to Sell Agreement" (the "Agreement") with the plaintiff/appellant, Crye-Leike, Inc., a realty company with offices in Shelby County, Tennessee. The Agreement, a form contract that Crye-Leike drafted, contained several detailed provisions governing the parties' relationship. The Agreement granted Crye-Leike an exclusive right to sell the Property until August 21, 2007. The Agreement also entitled Crye-Leike to a seven percent commission plus an administrative fee "if the Real Estate is sold or exchanged by CRYE-LEIKE, or the undersigned, or any other person, at any price acceptable to the undersigned, during the existence of [the Agreement]." Additionally, the Agreement provided:

> 12. The sale or exchange of the Real Estate to anyone to whom this property was shown or submitted or to any person to whom CRYE-LEIKE shall have offered the same during the term of this contract, if such sale is consummated within ninety days after its termination, shall be considered a sale effected by said CRYE-LEIKE and shall entitle CRYE-LEIKE to the commission herein agreed to be paid. (This will not apply if the subject property has been listed with another MLS member firm.) Seller agrees that if he fails or refuses to pay when due any sum which may be owing to Crye-Leike pursuant to this Exclusive Right to Sell agreement, he/she agrees to pay all cost of collection and/or litigation, including a reasonable attorney's fee.
>
> . . . .
>
> 24. The parties agree that this contract constitutes their entire agreement and that no oral or implied agreement exists. Any amendments to this agreement shall be made in writing, signed by both parties, and shall be attached to this original agreement and all other copies hereof.

Crye-Leike marketed the Property in several ways during the term of the Agreement. Crye-Leike placed a "For Sale" sign at the Property, took photographs of the Property for use in promotional materials, placed the Property in the Multiple Listing Service ("MLS") database,[1] and advertised the Property for sale on approximately fifty different internet websites. Crye-Leike also showed the Property to a few potential homebuyers. These efforts, however, did not procure a formal offer to purchase the Property during the original term of the Agreement. Shortly before the expiration of the Agreement, however, a couple from Alabama expressed interest in the Property to Barbara Weir, a sales associate with Prudential Collins-Maury, Inc.

---

[1]The MLS is "a computer system listing properties for sale to which the local real estate offices have access." *Prudential Botts & Assocs. v. Gupton*, 1994 WL 398826, at *1 (Tenn. Ct. App. Aug. 1, 1994).

The potential homebuyers, Calvin and Waukesha Sammons, contacted Ms. Weir to schedule viewings of homes for sale in Memphis. Mr. Sammons specifically identified the Property as one that he and his wife were interested in seeing.[2] Ms. Weir thereafter contacted representatives of Crye-Leike on August 21, 2007, to schedule an appointment for her clients to view the Property. As a result, Ms. Weir showed the Property to the Sammonses on the morning of August 22, 2007. The Sammonses viewed the Property a second time that afternoon, a showing Ms. Weir arranged through Crye-Leike's appointment center. The Sammonses, although later expressing interest to Ms. Weir, did not initially offer to purchase the Property.

Ms. Carver was not present at either showing of the Property and did not know the Sammonses had viewed or expressed interest in the Property until September 12, 2007.[3] The Sammonses contacted Ms. Carver at that time—after terminating the services of Ms. Weir—to communicate their interest in purchasing the Property. Additionally, the Sammonses mailed letters to Ms. Carver confirming their interest in the Property and setting forth their proposed terms of sale. On October 2, 2007, Ms. Carver met the Sammonses for the first time in person. After negotiating terms, Ms. Carver executed a contract with the Sammonses to sell the Property for $460,000.[4] The sale closed on October 22, 2007.

Crye-Leike demanded upon learning of the sale that Ms. Carver pay a seven percent commission pursuant to the terms of the Agreement and initiated this action after Ms. Carver refused. The realty company alleged it was entitled to a commission because its associate broker, Mr. Mills, participated in or caused the Property to be shown to the Sammonses prior to August 21 and the Sammonses purchased the Property within ninety days of the Agreement's expiration date. Crye-Leike further alleged in its amended complaint that "through the actions of the plaintiff and defendant, the listing agreement was extended and terminated on August 30, 2007" and, thus, it was entitled to a commission because the August 22 showing occurred within the mutually agreed contractual period. Crye-Leike requested an award of $32,350 for the commission and administrative fee purportedly due under the Agreement, as well as an award of attorney's fees, prejudgment interest, and costs. Ms. Carver denied all material allegations in her answer, and litigation ensued.

---

[2]Mr. Sammons later explained he learned the Property was for sale after browsing an unidentified internet website that provided an informational report and MLS number for the Property.

[3]We note there is no evidence that Ms. Carver in bad faith attempted to deprive Crye-Leike of a commission.

[4]Notably, the parties entered into a contractual agreement for the sale of the Property only after bargaining over certain terms and agreeing on a price different from that contained in the listing agreement.

The parties proceeded to a bench trial in April 2010.[5] A major dispute at trial concerned whether the parties orally agreed to extend the Agreement. According to Ms. Carver, the Agreement expired on August 21 without any mention of continuing the parties' relationship. She testified she at no point had a conversation with Mr. Mills about extending the Agreement beyond August 21. Instead, she called Mr. Mills sometime between the expiration of the Agreement and August 30 pointedly to request that he remove her home from the market. And she called a second time on August 30 specifically to request that Crye-Leike remove the "For Sale" sign from her property.[6] Mr. Mills offered a different version of events. He agreed Ms. Carver called to terminate the listing around August 30 but testified he had previously contacted Ms. Carver about extending the Agreement. According to Mr. Mills, Ms. Carver agreed to extend the listing for "maybe a couple of weeks" and then make up her mind about whether to renew the Agreement. Mr. Mills conceded, however, he did not reduce the alleged oral agreement to writing and he did not attach any signed writing to the original contract.

The trial court ruled in favor of Ms. Carver, setting forth detailed findings of fact and conclusions of law in a memorandum opinion. The trial court rejected Crye-Leike's contention that the parties orally modified the Agreement to extend until August 30. The court explained the Agreement plainly prohibited amendment of its terms by oral modification. The Agreement instead required any amendment to be made in writing, signed by the parties, and attached to the original contract, which the parties did not do. The court also rejected the contention that the parties extended the agreement through their actions.[7] The court added:

> Plaintiff's listing agent for the Property, Mills, testified that he was aware of the Agreement's expiration date and its provision barring oral agreements and requiring any modifications to be made in writing. This entire dispute could have been avoided if Mills had simply obtained the Defendant's signature on a written modification agreement extending the expiration date of the Agreement. Nonetheless, Mills chose not to reduce the alleged modification to writing as required by the Agreement.

---

[5]The parties filed and the trial court denied competing motions for summary judgment.

[6]Ms. Carver buttressed her testimony with a Crye-Leike work order confirming the removal of the "For Sale" sign from the Property on September 1, 2007, which she entered as an exhibit at trial.

[7]The court did not expressly explain why it rejected Crye-Leike's argument that the parties extended the Agreement through their actions, but it appears the court found the contractual language in paragraph twenty-four dispositive.

The only remaining avenue of recovery existed in paragraph twelve of the Agreement, which the court noted could conceivably entitle Crye-Leike to a commission. The court nonetheless held the Sammonses were not shown or submitted the Property until after the contractual expiration date of August 21, resolving the ambiguity of the terms "shown" and "submitted" in favor of Ms. Carver. The court consequently concluded Crye-Leike was not entitled to receive a commission on the sale of the Property. Crye-Leike timely appealed.

## II. Issues Presented

Crye-Leike presents the following issues, as we perceive them, for appellate review:

(1)    whether the Property was shown, submitted, or offered to the Sammonses prior to August 21, 2007;

(2)    whether the parties orally amended the Agreement to extend the listing period through August 30, 2007; and

(3)    whether the parties, through their actions, extended the Agreement to August 30, 2007.

## III. Standard of Review

We review the judgment of a trial court in a bench trial *de novo* upon the record, according a presumption of correctness to the factual findings of the court below. Tenn. R. App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993) (citation omitted). This Court will not disturb a trial court's finding of fact unless the evidence preponderates against its finding. *Berryhill v. Rhodes*, 21 S.W.3d 188, 190 (Tenn. 2000) (citation omitted). Factual findings based on the trial court's assessment of witness credibility receive an even higher degree of deference. *See Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007) (citations omitted). We will overturn factual findings turning on the credibility of the witnesses only if clear and convincing evidence demonstrates error in the court's evaluation. *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn.1999). Our review is *de novo* with no presumption of correctness where the trial court does not produce findings of fact. *Archer v. Archer*, 907 S.W.2d 412, 416 (Tenn. Ct. App. 1995) (citations omitted). We likewise review the trial court's resolution of legal questions *de novo* with no presumption of correctness. *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000) (citation omitted). "The interpretation of a contract is a matter of law that requires a *de novo* review on appeal." *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999) (citing *Hamblen Cnty. v. City of Morristown*, 656 S.W.2d 331, 335-336 (Tenn. 1983)).

## IV. Analysis

### *A. Shown, Submitted, or Offered*

The first question before this Court is whether Crye-Leike is entitled to a commission because the Property was shown, submitted, or offered prior to August 21 to persons purchasing the property within ninety days of the Agreement's expiration. Crye Leike argues it should receive a commission on the sale of the Property because the eventual purchasers, the Sammonses, would not have learned about the Property absent the efforts of Mr. Mills. Crye-Leike contends not only that it was the procuring cause of the sale from Ms. Carver to the Sammonses, but also that the Property was shown, submitted, and offered to the Sammonses through the listing of the Property on various internet websites prior to the expiration of the Agreement. Ms. Carver disagrees that Crye-Leike earned a commission. She argues Crye-Leike's display of information about the Property in an internet advertisement was not, construing the terms strictly against the drafter of the Agreement, a showing of the Property, a submission of the Property, or an offering of the Property to the Sammonses. She further argues the mere booking of an appointment to show the Property did not constitute a showing of the Property. Crye-Leike did not perform any services within the contractual term entitling it to a commission according to Ms. Carver.

The trial court determined, after considering Crye-Leike's argument that the phrase "shown or submitted" encompassed the transfer of information from Crye-Leike to the buyer of the Property via internet advertisement, that the terms "shown" and "submitted" were susceptible to multiple interpretations. Construing these terms strictly against Crye-Leike as the drafter of the agreement, the court concluded the term "shown" included only those situations where a representative of Crye-Leike was "physically present at a property to allow access to it so that a prospective buyer may view it." The court further concluded the term "submitted" concerned a scenario where Crye-Leike provided a prospective buyer and his or her agent an opportunity to view a property by giving access to a secure lock box or comparable device containing a key to the property. Because Crye-Leike did not show or submit the Property to the Sammonses prior to the expiration of the contract, the court concluded Crye-Leike was not entitled to the requested commission.[8]

We agree with the trial court's general approach to contractual interpretation. "A cardinal rule of contractual interpretation is to ascertain and give effect to the intent of the parties." *Allmand v. Pavletic*, 292 S.W.3d 618, 630 (Tenn. 2009) (citing *U.S. Bank N.A. v.*

---

[8]The trial court did not expressly address whether Crye-Leike offered the Property to the Sammonses, although Crye-Leike mentioned the issue in its opening statement. One might question on the record before us whether the parties actually tried this issue, but Ms. Carver does not object to its consideration on appeal.

*Tenn. Farmers Mut. Ins. Co.*, 277 S.W.3d 381, 386–86 (Tenn. 2009); *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006)). "In interpreting contractual language, courts look to the plain meaning of the words in the document to ascertain the parties' intent." *Watson*, 195 S.W.3d at 611 (citing *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 889-90 (Tenn. 2002)). "When the language of the contract is plain and unambiguous, courts determine the intentions of the parties from the four corners of the contract, interpreting and enforcing it as written." *Union Realty Co., Ltd. v. Family Dollar Stores of Tenn., Inc.*, 255 S.W.3d 586, 591 (Tenn. Ct. App. 2007) (citing *Int'l Flight Ctr. v. City of Murfreesboro*, 45 S.W.3d 565, 570 (Tenn. Ct. App. 2000)). "In such a case, the contract is interpreted according to its plain terms as written, and the language used is taken in its 'plain, ordinary, and popular sense.'" *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 704 (Tenn. 2008) (quoting *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975)); (citing *Planters Gin Co.*, 78 S.W.3d at 890).

"However, on occasion, a contractual provision may be susceptible to more than one reasonable interpretation, rendering the terms of the contract ambiguous." *Id.* (citing *Planters Gin. Co.*, 78 S.W.3d at 890. "'Ambiguity, however, does not arise in a contract merely because the parties may differ as to interpretations of certain of its provisions. A contract is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one.'" *Id.* (quoting *Johnson v. Johnson*, 37 S.W.3d 892, 896 (Tenn. 2001)). If a contract is ambiguous, "the court must apply established rules of construction to determine the intent of the parties." *Watson*, 195 S.W.3d at 611 (citing *Planters Gin Co.*, 78 S.W.3d at 890). Tennessee courts adhere to the general rule that ambiguities in a contract are construed against the drafter. *E.g., Spiegel v. Thomas, Mann & Smith, P.C.*, 811 S.W.2d 528, 531 (Tenn. 1991) (citing *Hanover Ins. Co. v. Haney*, 425 S.W.2d 590 (1968)); *Ralph v. Pipkin*, 183 S.W.3d 362, 367 (Tenn. Ct. App. 2005) (citing *Certain Underwriter's at Lloyd's of London v. Transcarriers Inc.*, 107 S.W.3d 496, 499 (Tenn. Ct. App. 2002)). "However, the courts will not rewrite an unambiguous term simply to avoid harsh results." *Pipkin*, 183 S.W.3d at 367 (citing *Transcarriers Inc.*, 107 S.W.3d at 499). "The court will not use a strained construction of the language to find an ambiguity where none exists." *Maggart*, 259 S.W.3d at 704 (citing *Farmers–Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975)).

We agree with the trial court that the Agreement is ambiguous. Our analysis varies, however, because we find the ambiguity does not stem solely from the use of the terms shown, submitted, or offered. While there are varying definitions of these terms, the parties have not proposed any acceptable definition which alone precludes Crye-Leike from recovering. Rather, the pivotal issue in our view is whether the Agreement requires individualized or direct contact with a purchaser as opposed to the mere advertisement of a property to the general public. Paragraph twelve of the Agreement, which entitles Crye-

Leike to a commission for a sale occurring within ninety days of the Agreement's expiration, is triggered only if the sale is made "to anyone to whom" the Property was shown or submitted or "to any person to whom" Crye-Leike offered the Property during the term of the contract. This language is susceptible to more than one reasonable interpretation.

Paragraph twelve could broadly give rise to a commission where the Property is generally shown, submitted, or offered to the public via advertisements and the eventual purchaser learns about the property through said advertisements. Relying on accepted definitions of the term "show," one might variously define the showing of a home to include those instances where a person acts (1) "to cause or permit [the home] to be seen," (2) "to offer [the home] for sale," (3) "to display [the home] for the notice of others," or (4) "to point [the home] out to others." *Webster's Ninth New Collegiate Dictionary* 1090 (1991). One might likewise define the submission of a home to a potential homebuyer to require, *inter alia*, that a person "present or propose [a home] to another for review, consideration, or decision." *Id.* at 1175. Further, one might define an "offer" of the Property to require that Crye-Leike "present [the home] for acceptance or rejection" or "make [the home] available." *Id.* at 819. The display of a detailed internet advertisement arguably satisfies the contractual requirement that the Property be shown, submitted, or offered to an eventual purchaser where modern technology permits one to see or examine residential properties without being physically present at the property; permits a real estate broker to present the home generally to the public, including the purchaser, for review, consideration, or decision; and permits a real estate broker to present the home generally to the public, including the purchaser, for acceptance or rejection.

The showing, submission, or offering of a property to the eventual purchaser might, however, encompass a much more limited set of factual scenarios where targeted, personal interactions occur between a real estate professional and the individual homebuyer. The showing of a property to an eventual purchaser could require that a representative of Crye-Leike or another real estate professional be physically present to allow access to a property. A submission of a property to an eventual purchaser could only encompass a setting in which a property is personally presented for the consideration, review, or decision of an individual client. And an offering of the property to an eventual purchaser might occur only where one of Crye-Leike's agents has presented the home to the purchaser individually for acceptance or rejection.[9] Adoption of the more narrow construction of paragraph twelve would lead to

---

[9]Ms. Carver argues Crye-Leike would have "offered" the Property to the Sammonses only if the internet advertisement amounted to a legally binding offer to sell, thereby creating the power of acceptance in the purchaser and giving rise to a binding contract in the event of acceptance. We disagree, however, that such a definition of the term "offered" should prevail where the contract does not expressly delegate

(continued...)

the conclusion that the Property was not shown, submitted, or offered to the Sammonses prior to August 21.

We conclude the Agreement is ambiguous and therefore disagree with Crye-Leike's suggestion that evidence of the eventual purchasers' response to an internet advertisement directed at the general public prior to the expiration of the Agreement entitled the realty company to a commission on the subsequent sale of the Property. The Agreement, construed strictly against Crye-Leike, requires something more. Neither Mr. Mills nor Ms. Weir provided the Sammonses with access to the Property or an opportunity to view the Property in person prior to August 21. Neither Mr. Mills nor Ms. Weir individually proposed the Property to the Sammonses for the consideration, review, or decision prior to August 21. And Mr. Mills did not individually present the Property to the Sammonses for acceptance or rejection prior to August 21. We therefore hold the Property was not shown, submitted, or offered to the eventual purchasers prior to expiration of the Agreement as expressly set forth therein. Crye-Leike is not entitled to a commission under paragraph twelve of the Agreement.

Crye-Leike next contends it should recover because Mr. Mills was the "procuring cause" of the sale between Ms. Carver and the Sammonses.[10] *See generally Pacesetter*

---

[9](...continued)
authority to the agent to enter into a binding agreement without further assent from the seller. *Kelly v. Longmire*, 435 S.W.2d 818, 821-22 (Tenn. 1968) ([I]t is the settled rule in Tennessee and in many other jurisdictions that a contract authorizing a real estate agent to sell a tract of land does not authorize the agent to make a contract of sale which would be binding on the owner, because such a contract must, in the absence of extraordinary provisions, be considered only a contract of employment of an agent."); *accord McFadden v. Crisler*, 213 S.W. 912, 914 (Tenn. 1919). Because the Agreement did not explicitly vest Crye-Leike and its agents with authority to make a binding offer to sell the property, we decline to interpret the use of the term "offered" in paragraph twelve as limiting the circumstances under which Crye-Leike might be entitled to a commission to those involving a binding offer to sell.

[10]We express no opinion on whether Crye-Leike's efforts were the procuring cause of the eventual sale of the Property to the Sammonses. We note, however, this Court in *Robinson v. Kemmons Wilson Realty Co.*, 293 S.W.2d 574 (Tenn. Ct. App. 1956), stated as follows:

'If a broker, after introducing a prospective customer to his employer to no purpose, abandons his employment entirely, or if, after procuring a person who proves to be unwilling to accept the terms of his principal, he merely ceases to make further endeavors to negotiate a deal with that particular individual and all negotiations in that direction are completely broken off and terminated, he will not be entitled to a commission if his employer subsequently renews negotiations with the same person, either directly or through the medium of another agent, and thus effects a sale without further effort of the broker first

(continued...)

-9-

*Props., Inc. v. Hardaway*, 635 S.W.2d 382 (Tenn. Ct. App. 1981) (analyzing the procuring cause doctrine at length); *Robinson v. Kemmons Wilson Realty Co.*, 293 S.W.2d 574 (Tenn. Ct. App. 1956) (same). The existence of the procuring cause doctrine as a basis and/or prerequisite for recovery of a commission in some cases, however, does not preclude a seller and broker from defining more precisely the broker's duties under a listing agreement. Mark S. Dennison, *Cause of Action By Real-Estate Broker to Recover Commission*, *in* 27 *Causes of Action Second (COA 2d)* 703, 749 (2005) (citing *Caldwell v. Consolidated Realty and Mgmt. Co.*, 668 P.2d 284, 286 (Nev. 1983); *Greene v. Hellman*, 412 N.E.2d 1301, 1307 (N.Y. 1980); *Nollner v. Thomas*, 533 P.2d 478, 481 (Nev. 1975)). It also does not prevent contracting parties from more broadly or more narrowly defining the circumstances under which a broker is entitled to a commission. *Id.* (citations omitted). "Where the broker's entitlement to a commission hinges on specific contractual language, that language, of course, will control." *Id.* (citation omitted); *see also Kahler, Inc. v. Weiss*, 539 N.W.2d 86, 90 (S.D. 1995) ("Under the explicit terms of this contract, the question of who was the procuring cause of the sale is irrelevant."); *Aerotronics, Inc. v. Pneumo Abex Corp.*, 62 F.3d 1053, 1064 (8th Cir. 1995) ("In both Michigan and Ohio, the procuring cause doctrine is limited by the terms of a contract; it cannot be used to supplant or contradict the terms of a contract entered into between parties.").

It is well-settled in Tennessee "that parties to an agreement have the right and power to construct their own bargains." *Planters Gin Co. v. Federal Compress & Warehouse Co.*, 78 S.W.3d 885, 892 (Tenn. 2002) (internal quotation marks omitted) (quoting Blake D. Morant, *Contracts Limiting Liability: A Paradox with Tacit Solutions*, 69 Tul. L. Rev. 715, 716 (1995)). As this Court has stated,

> The rights and obligations of contracting parties are governed by their written agreements. The courts must interpret these contracts as written. We are not at liberty to make a new contract for parties who have spoken for themselves, nor are we at liberty to relieve parties from their contractual obligations simply because these obligations later prove to be burdensome or unwise.

---

[10](...continued)
employed.' 8 Am. Jur., Brokers, Sec. 144, p. 1069.

*Robinson*, 293 S.W.2d at 585. The application of this rule is "doubly strong" where the resumption of negotiations is not brought about by any effort of the seller but instead results from an unexpected inquiry of the eventual purchaser. *Id.* As this Court has previously explained, a broker who introduces a purchaser and seller does not obtain a "perpetually vested interest" in any transaction taking place between those parties. *Pacesetter Properties Inc. v. Hardaway*, 635 S.W.2d 382, 389 (Tenn. Ct. App. 1981).

*Hillsboro Plaza Enters. v. Moon*, 860 S.W.2d 45, 47 (Tenn. Ct. App. 1993) (internal citations omitted). "A broker's right to be paid a commission is a contractual matter." *Mande Realty v. Deerhead Resort, Inc.*, Sequatchie Circuit App. No. 87-9-II, 1988 WL 5694, at *2 (Tenn. Ct. App. Jan. 29, 1988) (citing *Robinson*, 293 S.W.2d at 582-83). Thus, where contracting parties agree upon the detailed circumstances under which a broker is entitled to a commission after the expiration of a listing agreement, the contractual language setting forth those rights and duties will control. *Cf. Grubb & Ellis/Centennial, Inc. v. Gaedeke Holdings, Ltd.*, 401 F.3d 770, 774 (6th Cir. 2005) (interpreting contractual language leaving "little room for interpretation regarding the right to a commission after the agreement has ended" as not requiring a realty company to establish it was the procuring cause of a sale to recover under Tennessee law). Because the Agreement does not provide Crye-Leike a right to a commission if it was the "procuring cause" of a sale taking place after the contract's expiration, the application of the doctrine under the facts is irrelevant. The crux of the matter is whether Crye-Leike has demonstrated a right to recover a commission under the Agreement. It has not.

### B. Oral Modification

The next question before this Court is whether the parties orally modified or amended the Agreement to remain in effect beyond August 21. Although the trial court noted Mr. Mills testified vaguely on the alleged oral modification of the Agreement, the court did not offer a factual finding on whether the parties agreed prior to August 21 that Crye-Leike would continue to market the Property. The court instead concluded the plain and unambiguous language of the contract precluded oral modification of the expiration date. Thus, the contractual provision barring oral modification, not the existence of an actual oral agreement, was dispositive.

The trial court's interpretation of the Agreement finds support in the trial testimony of Richard Leike, a principal and broker at Crye-Leike, who conceded that any amendment of the expiration date should have been made in writing. Mr. Leike testified not only that he expects Crye-Leike agents to abide by the written modification requirement, but he also candidly explained he would not expect to be bound by an oral agreement between an agent and a seller that was not put into writing. He further stated that the Agreement, a form contract which he had a hand in creating, never calls for the making of an oral agreement. The following exchange illustrates Mr. Leike's understanding of the language prohibiting oral modification:

> [Defendant's counsel]: Under the procedures in effect at your company, or if [the expiration date] is to be extended or shortened, would it have to be put in writing?

[Mr. Leike]:  Should be, yes, sir.

[Defendant's counsel]:    I mean, if a person claims I signed this, but I called one day, and I told them that I wanted to change [the expiration date] to be July the 21st instead of August the 21st, and the agent said yes, but they didn't put it in writing, you wouldn't expect to be bound by it, would you?

[Mr. Leike]:  No, Sir.

Mr. Leike similarly testified that any alleged oral modification of the commission due under the Agreement would be ineffective unless documented by a signed commission deviation form or other writing.

Crye-Leike nevertheless contends the language excluding oral modification does not apply under the facts.  Crye-Leike argues Ms. Carver waived the right to enforce the provision of the contract requiring all amendments to be made in writing and, thus, their oral agreement to extend the Agreement was binding.  Crye-Leike submits its actions in scheduling appointments with Ms. Carver after August 21 to show the Property and Ms. Carver's delay in requesting Crye-Leike remove the "For Sale" sign from her property until August 30 support its contention that the parties reached an oral agreement to extend the contractual listing period.  Crye-Leike further submits these actions demonstrate waiver of Ms. Carver's right to enforce the language in the contract strictly requiring all amendments to be made in writing.  Ms. Carver disagrees, arguing that no oral agreement occurred and that Tennessee Code Annotated section 47-50-112(c) prohibited the asserted waiver.[11]

---

[11]Tennessee Code Annotated section 47-50-112(c) provides in pertinent part that if any contact "contains a *provision to the effect* that no waiver of any terms or provisions thereof shall be valid unless such waiver is in writing, no court shall give effect to any such waiver unless it is in writing." Tenn. Code Ann. § 47-50-112(c) (2001) (emphasis added). There is, at a minimum, room for disagreement about whether a sufficient distinction exists between oral modification or amendment of a contractual term and waiver of a contractual right such that Tennessee Code Annotated section 47-50-112(c) does not apply in cases involving the former. *But see* Francis L. Lloyd Jr., *Contracts To Be Enforced As Written -- Or Not!*, 45 Tenn. B.J. 18, 22, 25 (2009) (interpreting this Court's decision in *Tidwell v. Morgan Building Sys., Inc.*, 840 S.W.2d 373 (Tenn. Ct. App. 1992), as treating Tennessee Code Annotated section 47-50-112(c) applicable to a contractual prohibition against modification other than in writing, and suggesting the legislature amend Tennessee Code Annotated section 47-50-112(c) to codify "the existing judicial understanding that the subsection makes effective a contractual prohibition against oral modification, even through the existing statutory language uses the narrower term 'waiver'"). We do not need to address this issue, however, because Crye-Leike has not established a waiver of the language requiring written amendment of the contract.  We also do not have to determine whether Crye-Leike impermissibly asserted waiver as an "offensive weapon." *GuestHouse Intern., LLC v. Shoney's N. Am. Corp.*, 330 S.W.3d 166, 202 (Tenn. Ct.
(continued...)

-12-

A principal to an exclusive listing agreement may, as a general matter, waive the agreement's expiration date, accept the continued services of the broker, treat the contract as still in force, and consequently entitle the broker to a commission for a subsequent sale. *Miller v. Bacon*, 12 Tenn. App. 123, 1930 WL 7596, at *3 (Tenn. Ct. App. 1930) (citation omitted). To establish waiver, however, the broker must demonstrate the principal voluntarily relinquished a known right. *Chattem, Inc. v. Provident Life & Accident Ins. Co.*, 676 S.W.2d 953, 955 (Tenn. 1984) (citing *Baird v. Fidelity–Phenix Fire Ins. Co.*, 162 S.W.2d 384, 389 (Tenn. 1942)).[12] Waiver occurs where a party "by express declaration; or by acts and declarations manifesting an intent and purpose not to claim the supposed advantage; or by course of acts and conduct, or by so neglecting and failing to act, as to induce a belief that it was [the party's] intention and purpose to waive." *94th Aero Squadron of Memphis, Inc. v. Memphis–Shelby Cnty. Airport*, 169 S.W.3d 627, 636 (Tenn. Ct. App. 2004) (internal quotation marks omitted) (alteration in original) (quoting *Jenkins Subway, Inc. v. Jones*, 990 S.W.2d 713, 722 (Tenn. Ct. App. 1998)). "[W]aiver is proven by a clear, unequivocal and decisive act of the party, showing a purpose to forgo the right or benefit which is waived." *GuestHouse Intern., LLC v. Shoney's N. Am. Corp.*, 330 S.W.3d 166, 202 (Tenn. Ct. App. 2010) (internal quotation marks omitted) (quoting *E & A Ne. Ltd. P'ship v. Music City Record Distribs., Inc.*, No. M2005-01207-COA-R3-CV, 2007 WL 858779, at *7 (Tenn. Ct. App. Mar. 21, 2007)). "A party who raises the issue of waiver has the burden of proving it by a preponderance of the evidence." *Madden Phillips Const., Inc. v. GGAT Dev. Corp.,* 315 S.W.3d 800, 813 (Tenn. Ct. App. 2009) (citing *Jenkins*, 990 S.W.2d at 722).

We conclude Crye Leike has not borne its burden to demonstrate waiver. The only evidence of the alleged oral modification comes from the testimony of Crye-Leike's agent. Mr. Mills testified that he contacted Ms. Carver as the expiration date neared to see if she wanted to continue the listing. According to Mr. Mills, Ms. Carver told him "at that point that she wanted to list it -- continue for a while, maybe a couple of weeks, and then she would make up her mind." Ms. Carver unequivocally denied that any such conversation occurred. In addition to Ms. Carver's testimony rejecting the assertion that the parties orally agreed to extend the Agreement, there is no evidence demonstrating the parties discussed or contemplated waiving the provision of the Agreement requiring amendments to be made in a writing signed by the parties.

---

[11](...continued)
App. 2010) (footnote omitted) (citation omitted) (quoting Am. Jur. 2d Estoppel & Waiver § 167 (2000)) (internal quotation marks omitted).

[12]"[T]he definition of waiver as 'a voluntary relinquishment by a party of a known right,' applies to a waiver of the right to enforce a provision in a contract, not to the waiver of a right acquired under the contract in the agreed exchange." *GuestHouse Intern., LLC v. Shoney's N. Am. Corp.*, 330 S.W.3d 166, 201-02 (Tenn. Ct. App. 2010) (citations omitted).

Given the limited and vague nature of Mr. Mills's testimony, we conclude the preponderance of the evidence does not establish a clear, unequivocal, and decisive act of Ms. Carver to waive the contractual provision requiring any amendment to be made in writing and signed by the parties. Moreover, the record does not contain evidence of an express declaration that Ms. Carver would not require amendments to be made in writing, acts or declarations manifesting intent not to enforce the provision requiring amendment of the Agreement by a signed writing, or a course of conduct supporting waiver of the same. Because the Agreement plainly requires "[a]ny amendments . . . shall be made in writing, signed by both parties, and shall be attached to this original agreement and all other copies hereof," we agree with the trial court that no enforceable oral modification of the Agreement's expiration date occurred.

### C. Extension Through Action

Crye-Leike argues that, even if the alleged oral modification was ineffective, the parties through their actions extended the Agreement beyond August 21. Crye-Leike presents a multifaceted argument on this issue. The plaintiff first contends the parties renewed the agreement by implication when Ms. Carver permitted Crye-Leike to arrange a second showing of the Property on August 22. Crye-Leike next contends the doctrines of waiver, equitable estoppel, and acquiescence preclude Ms. Carver from relying on the expiration date set forth in the Agreement.[13] Finally, Crye-Leike submits the parties through their actions established a quasi contract or implied in fact contract entitling the realty company to a reasonable fee for its services. We will address these assertions in turn.

### i. Implied Renewal

Crye-Leike argues Ms. Carver's actions prior to and following August 21 impliedly renewed the Agreement for an unspecified period. This Court in *Pyles v. Cole*, 241 S.W.2d 841 (Tenn. Ct. App. 1951), considered a similar argument where the sellers had acquiesced in a real estate broker's efforts to produce a purchase after the expiration of a ninety-day listing agreement. *Pyles*, 241 S.W.2d at 843. This Court reasoned that "where a provision in a brokerage contract provides for termination at a fixed time the contract will be deemed renewed and the termination provision waived where the principal has recognized that the broker is continuing negotiations looking to a sale or requests that he do so." *Id.* (citations omitted). The real estate broker in *Pyles* was entitled to a commission because the sellers "impliedly renewed the contract by accepting [the broker's] efforts and services and agreeing

---

[13]Tennessee Code Annotated section 47-50-112(c), even if it applied under the facts, would not prohibit Crye-Leike from recovering under alternative theories such as equitable estoppel and quantum meruit. *See Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 603 (Tenn. Ct. App. 1999).

to pay commissions in event of a sale to the prospect originated by him." *Id.*

The rule of *Pyles*, however, is inapplicable because the contract governing the parties' relationship in that case did not contain language similar to the language controlling our decision. Here, the parties specifically stated "that [the Agreement] constitutes their entire agreement and that no oral or implied agreement exists." This provision prohibits implied renewal of the Agreement. Additionally, Crye-Leike presented no evidence to demonstrate Ms. Carver recognized Mr. Mills was continuing negotiations looking to a sale or that she requested he do so. Mr. Mills in fact never entered into negotiations with the Sammonses regarding the sale of the Property. We accordingly conclude the parties did not impliedly renew the Agreement.

### ii. Equitable Estoppel, Waiver, and Acquiescence

Crye-Leike next contends the acts of Ms. Carver entitled it to a commission on the sale of the Property under the related theories of waiver, equitable estoppel, and acquiescence.[14] "As with the defense of waiver, the burden of establishing an estoppel also rests upon the party who invokes it." *Jenkins Subway, Inc. v. Jones*, 990 S.W.2d 713, 723 (Tenn. Ct. App. 1998) (citing *Third Nat'l Bank v. Capitol Records, Inc.*, 445 S.W.2d 471, 476 (Tenn. Ct. App. 1969)).

> The essential elements of an equitable estoppel as related to the party estopped are said to be (1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) Intention, or at least expectation that such conduct shall be acted upon by the other party; (3) Knowledge, actual or constructive of the real facts. As related to the party claiming the estoppel they are (1) Lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) Reliance upon the conduct of the party estopped; and (3) Action based thereon of such a character as to change his position prejudicially[.]

*Harvey v. Farmers Ins. Exchange*, 286 S.W.3d 298, 304 (Tenn. Ct. App. 2008) (quoting *Callahan v. Town of Middleton*, 292 S.W.2d 501, 508 (Tenn. Ct. App. 1954)); *accord Osborne v. Mountain Life Ins. Co.*, 130 S.W.3d 769, 774 (Tenn. 2004) (citations omitted). "Estoppel requires as a minimum (1) reliance upon the statement or actions of another

---

[14]We again decline to opine on whether and under what circumstances these and other affirmative defenses provide avenues by which a plaintiff may effectively abrogate a contractual provision.

without opportunity to know the truth and (2) action based on that reliance which results in detriment to the one acting." *Werne v. Sanderson*, 954 S.W.2d 742, 746 (Tenn. Ct. App. 1997) (citing *Campbell v. Precision Rubber Products Corp*., 737 S.W.2d 283, 286 (Tenn. Ct. App. 1987)). "Estoppel is not favored and it is the burden of the party seeking to invoke the doctrine to prove each and every element thereof." *Buchholz v. Tenn. Farmers Life Reassurance Co.*, 145 S.W.3d 80, 85 (Tenn. Ct. App. 2003) (citing *Robinson v. Tenn. Farmers Mut. Ins. Co.*, 857 S.W.2d 559, 563 (Tenn. Ct. App. 1993)).

> "Acquiescence" has been defined as a conduct from which may be inferred an assent with a consequent estoppel or quasi-estoppel, and also has been described as a quasi-estoppel, or a form of estoppel. An acquiescence to a transaction is a person's tacit or passive acceptance, or an implied consent to an act. Generally, acquiescence as a defense has a dual nature in that, it may on the one hand, rest on the principle of ratification and be denominated an "implied ratification," or, on the other hand, rest on the principle of estoppel and be denominated as "equitable estoppel." The doctrine arises where a person knows or ought to know that he or she is entitled to enforce his or her right to impeach a transaction and neglects to do so for such a time as would imply that he or she intended to waive or abandon his or her right.

31 C.J.S. *Estoppel and Waiver* § 175 (2008) (footnotes omitted); *accord Hinton v. Stephens*, No. W2000-02727-COA-R3-CV, 2001 WL 1176012, at *3 (Tenn. Ct. App. Oct. 4, 2001) (citation omitted).

Crye-Leike has not established that Ms. Carver waived the right to enforce the expiration date of the Agreement, that Ms. Carver should be equitably estopped from relying on the expiration date set forth in the Agreement, or that Ms. Carver acquiesced in the alleged extension of the Agreement. The preponderance of the evidence does not establish a clear, unequivocal, and decisive act of Ms. Carver to waive the August 21 expiration date. Crye-Leike likewise did not establish conduct amounting to a false representation, concealing material facts, or conveying an impression the facts were otherwise than, and inconsistent with, those which Ms. Carver now relies upon. And Ms. Carver did not passively accept the services of Crye-Leike for such a period of time as to impliedly consent to or acquiesce in the extension of the Agreement. We thus hold Ms. Carver rightfully may assert August 21 as the expiration date of the Agreement.

### iii. Quasi Contract

The final issue before this Court is whether Crye-Leike is entitled to recover under the theory of quasi contract. "Actions brought upon theories of unjust enrichment, quasi

contract, contracts implied in law, and quantum meruit are essentially the same." *Paschall's, Inc. v. Dozier*, 407 S.W.2d 150, 154 (Tenn. 1966). "Courts frequently employ the various terminology interchangeably to describe that class of implied obligations where, on the basis of justice and equity, the law will impose a contractual relationship between parties, regardless of their assent thereto." *Id.* These equitable doctrines are "founded on the principle that a party receiving a benefit desired by him, under circumstances rendering it inequitable to retain it without making compensation, must do so." *Id.* (citation omitted).

A party seeking to recover on one of these theories must demonstrate the following:

(1) there must be no existing, enforceable contract between the parties covering the same subject matter, *Robinson v. Durabilt Mfg. Co.*, 195 Tenn. 452, 454-55, 260 S.W.2d 174, 175 (1953);

(2) the party seeking recovery must prove that it provided valuable goods and services, *Moyers v. Graham*, 83 Tenn. 57, 62 (1885); *Wrinkle v. J.F. Larue & Son*, 9 Tenn. App. 161, 165–66 (1927);

(3) the party to be charged must have received the goods and services, *Paschall's, Inc. v. Dozier*, 219 Tenn. 45, 54, 407 S.W.2d 150, 154 (1966); *Jaffe v. Bolton*, 817 S.W.2d 19, 26 (Tenn. Ct. App. 1991);

(4) the circumstances must indicate that the parties involved in the transaction should have reasonably understood that the person providing the goods or services expected to be compensated, *V.L. Nicholson Co. v. Transcon Inv. & Fin. Ltd.*, 595 S.W.2d 474, 482 (Tenn. 1980); and

(5) the circumstances must also demonstrate that it would be unjust for the party benefitting from the goods or services to retain them without paying for them. *Pascall's, Inc. v. Dozier,* 219 Tenn. at 54, 407 S.W.2d at 154; *Reprise Capital Corp. v. Rogers Group, Inc.,* 802 S.W.2d 608, 610 (Tenn. Ct. App. 1990).

*Castelli v. Lien*, 910 S.W.2d 420, 427 (Tenn. Ct. App. 1995); *accord Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 197-98 (Tenn. 2001) (citing *Swafford v. Harris*, 967 S.W.2d 319, 324 (Tenn. 1998)).

The most glaring problem with Crye-Leike's position is that it did not present this

issue for consideration before the trial court.[15] Crye-Leike's complaint and amended complaint alleged only that Crye-Leike caused the Property to be shown to the eventual purchasers prior to August 21 and, in the alternative, that the parties by their actions extended the contract through August 30. Crye-Leike's allegations focused on the right to a commission under the Agreement; Crye-Leike did not allege that a separate quasi-contractual or implied obligation to pay the reasonable value of its services arose separate from the Agreement. Crye-Leike similarly did not argue this issue at the summary judgment stage, and the trial transcript does not contain a single reference to unjust enrichment, quasi contract, contract implied in law, or quantum meruit. Furthermore, Crye-Leike did not submit evidence of the reasonable value of the services rendered after the expiration of the Agreement. The trial court consequently did not rule on this issue in its memorandum opinion. Because Crye-Leike did not argue it should recover on the basis of quasi contract in the trial court, we decline to address it for the first time on appeal.[16] *See Davis v. McGuigan,* 325 S.W.3d 149, 154 n.1 (Tenn. 2010) (citing *Fayne v. Vincent*, 301 S.W.3d 162, 171 (Tenn. 2009).

Crye-Leike, a sophisticated party with years of experience in the residential real estate business, knowingly incurred the risk it might not recover a commission by providing services in the absence of a signed writing extending the Agreement. As Mr. Leike candidly testified, Crye-Leike would oppose the assertion of a valid oral modification if the roles of the parties were reversed. While we do not suggest such conduct necessarily bars a realty company from recovering under equitable principles, Crye-Leike has not proven by a preponderance of the evidence that Ms. Carver's actions gave rise to waiver, equitable estoppel, or acquiescence under the facts. Crye-Leike, as a result, has not demonstrated the Property was shown, submitted, or offered to the Sammonses prior to the expiration of the Agreement on August 21 or that Ms. Carver may not rely upon August 21 as the binding expiration date of the Agreement. We accordingly conclude Crye-Leike has not established a right to the requested commission.

### V. Conclusion

For the foregoing reasons, we affirm the decision of the trial court. We tax the costs

---

[15]We express no opinion on whether contractual language stating that no implied agreement exists would bar a finding of unjust enrichment, quasi contract, contract implied in law, or quantum meruit.

[16]Crye-Leike likewise did not argue that the parties entered into a separate, enforceable oral contract governing the provision of services subsequent to August 21 and, in any event, it did not establish the essential terms of any such contract by the requisite "clear, cogent, and convincing" evidence. *Parks v. Morris*, 914 S.W.2d 545, 547 (Tenn. Ct. App. 1995) (citing *Alexander v. C.C. Powell Realty Co.*, 535 S.W.2d 154, 157 (Tenn. Ct. App. 1975)).

of this appeal to the appellant, Crye-Leike, Inc., and its surety for which execution may issue if necessary.

_____
DAVID R. FARMER, JUDGE