# IN THE COURT OF APPEALS OF TENNESSEE
# AT NASHVILLE
May 10, 2011 Session

## MARCELINE LASATER v. KENNETH J. HAWKINS, ET AL.

### Appeal from the Circuit Court for Wilson County
### No. 2008-CV-933      Tom E. Gray, Chancellor

---

### No. M2010-01495-COA-R3-CV - Filed October 10, 2011

---

A contract for the sale of a sixty-four acre tract of land provided that a vacant house on the tract and the lot immediately surrounding it would automatically revert to the seller if the buyers did not install a water line across the property within a year of the contract's execution. The same condition was set out in the warranty deed. The buyers failed to install the water line, but the seller, a Texas resident, did not immediately attempt to retake possession of the house and lot. Five years after the contract was signed, the seller filed a "notice of automatic reverter of title," followed by a declaratory judgment suit to quiet title and to recover damages. The trial court granted partial summary judgment to the seller, ruling that the contract and the deed created a fee simple determinable and, therefore, that ownership of the disputed property reverted to her by operation of law one year after the contract of sale was executed. A hearing on damages resulted in an award to the seller of about $142,000 in compensatory damages, which included income that the buyers had collected from renting out the house prior to the filing of the notice of reverter. Buyers contend on appeal that the estate created by the contract of sale was not a fee simple determinable, but rather a fee simple subject to a condition subsequent, a form of future interest under which the property does not revert to the seller until the seller takes some action to retake possession of the property. Such an interest would result in a much smaller award of damages against the buyers under the circumstances of this case. We affirm the trial court's holding that the contract of sale created a fee simple determinable, but we modify its award of damages to correct an error.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
### Affirmed as Modified

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR. and ANDY D. BENNETT, JJ., joined.

James Haggard Kinnard, Lebanon, Tennessee; Shawn Joseph McBrien, Angelique P. Kane, Lebanon, Tennessee, for the appellants, Kenneth J. Hawkins, Ind. and as trustee for Kenneth J. Hawkins and Harold Gordon Bone and B & H Rentals, LLC.

Barbara Jones Perutelli, Nashville, Tennessee, for the appellee, Marceline Lasater.

**OPINION**

## I. A SALE OF REAL PROPERTY

In the Spring of 2003, Kenneth Hawkins and Harold Gordon Bone (collectively "Buyers") entered into negotiations with Marceline Lasater (hereinafter "Seller") for the sale of a portion of a 125 acre farm in Wilson County that Seller had inherited in 1989 from her grandfather Grant Dedman. On September 30, 2003, the parties entered into an "Agreement for Sale of Real Estate." Under the Agreement, Buyers paid $440,000 to obtain a 68.4 acre tract of land while Seller retained the remaining 57 acres of farm acreage. Buyers were developers who hoped to profit by subdividing the property they had bought. The tract they bought included a home that Grant Dedman had constructed in 1937 and occupied until his death, a structure referred to in the documents of sale as "the Rock House."

Several provisions of the sixteen-page contract of sale deal with the Rock House. One provision required the creation and recordation of a subdivision plat for the lot upon which the Rock House stands. (Further references to the Rock House in this opinion shall mean the house itself and the six acre lot surrounding it). Another provision, found in a section titled "Future Use and Sale of Property, Restrictions and Agreements," gave Seller the right of first refusal in the event that Sellers decided to sell the Rock House. Yet another provision in the same section required Buyers to install a municipal water line across the property they had purchased, to the western edge of Seller's adjoining property within one year of the closing date,[1] and to grant easements to Seller to allow her access to the waterline for the use of her property, which she also hoped to see developed.

For the purposes of this opinion, the most important part of the contract is found in the subsection dealing with the installation of the water line. It states that "[i]n the event that Buyer does not comply with the provisions in this paragraph, title to the Rock House Lot shall **automatically** revert to Seller in fee simple." Also, "[i]f no plat has been recorded creating a subdivided lot for the Rock House lot at the time of the event triggering the **automatic reverter,** then title to the property described as Tract No. 10 on the survey of the Grant Dedman Estate dated January 9, 1979. . . shall **automatically** revert to Seller in fee

---

[1]The closing document found in the record is dated September 29, 2003.

simple." Conversely, "[u]pon completion of the installation of the said waterline within one year of closing, the Grantor shall execute a Quitclaim deed to Grantee conveying all her right, title and interest in and to this **automatic reverter** and said document shall be recorded in the Registrar's Office for Wilson County, Tennessee." (emphasis added).

Finally, a section titled "Remedies," affirmed the right of each party to bring a suit for damages under Tennessee law in the event of breach of the contract by the other party, and declared that "[t]he prevailing party in any action proving substantial breach shall be entitled to recover its costs, expenses and attorney's fees incurred in the enforcement of this Agreement." The restrictions found in the contract of sale, including those concerning the Rock House, the waterline, and the possible reversion were all incorporated into the warranty deed.

Before the contract of sale was finalized, buyers planned to divide the property into a subdivision of 22 lots with septic tanks. A survey of the property revealed, however, that it was located within one mile of the city limits of the City of Lebanon, meaning that it was subject to possible annexation by the city, and therefore that its development fell within the jurisdiction of the Lebanon Planning Commission. In November of 2003, Buyers were informed that the Commission insisted that they would have to install sanitary sewers if they wished to develop the property. This requirement made their original plan economically unfeasible, so Buyers began making plans for a 96 lot subdivision on the property. This, however, raised additional permitting and financial problems.

Buyers had acted as partners in the development of Grant Dedman Estates (as their subdivision was to be named), but when their plans unraveled, they came to a parting of the ways. They filed suit in Chancery Court to dissolve B & H Rentals, a limited liability corporation that they used for lease transactions on the Rock House. They also moved the court for permission to sell at auction the land they had purchased from Seller. The promised water line was never installed, but Seller did not take any steps to retake possession of the Rock House until after Buyers asked her to execute a quitclaim deed so they could sell the property.

## II. REVERSION AND PARTIAL SUMMARY JUDGMENT

On August 7, 2008, Ms. Lasater filed a "Notice of Automatic Reverter of Title" in the Circuit Court of Wilson County. She followed that up on November 20, 2008, with a Complaint for Declaratory Judgment. The complaint named Kenneth Hawkins, Harold Bone and B & H Rentals as defendants. Seller asked the court to declare that she has been the owner of the Rock House in fee simple as a matter of law since September 30, 2004, and that she was entitled to damages from that date "for possession, waste, damages, trespass, rents

-3-

from September 30, 2004, and costs plus reasonable attorney's fees pursuant to the Agreement for Sale of Real Estate."

Buyers answered the complaint, raising several affirmative defenses: impossibility of performance, because they could not obtain the necessary permits before the waterline could be installed; and laches and waiver, because of Seller's failure to assert her right to reverter in a timely way.

On August 19, 2009, Seller filed a motion for summary judgment. She asserted that there were no material facts in dispute and that a proper construction of the contract of sale and the deed in this case showed that she was entitled to judgment as a matter of law. *See* Tenn. R. Civ. P. 56.04. Buyers' memorandum in opposition to the motion for summary judgment asserted the same defenses that they had raised in their answer. The trial court heard the motion on October 5, 2009, and granted Seller a partial summary judgment, holding that the reversionary clause in the contract created a fee simple determinable, which provided that ownership of the Rock House would automatically revert to her by operation of law if Buyers failed to install the agreed-upon water line within one year after the execution of the contract.

On October 14, 2009 the court conducted an evidentiary hearing on Buyers' defenses to the enforcement of the reversionary clause. Ms. Lasater testified that her parents and grandparents were born in Tennessee, but that she grew up in Texas, went to school there, and became an attorney. She has three children and operates a civil litigation practice in Austin. She travels to Tennessee on occasion. In recent years, this has usually been for the funerals of her older relatives. She hopes to develop the Tennessee property she still owns, perhaps as a bed and breakfast, sometime in the future after her children are grown and she is able to retire.

Seller was asked about the discussions that led the parties to include the waterline requirement in the contract of sale and her reason for drafting the provision that called for the automatic reversion of the Rock House in the event that Buyers did not install the waterline as promised. She explained that because she lives in Texas, she did not want to be in the position of having to file and prosecute a lawsuit in Tennessee in order to protect her rights. She therefore asked her Tennessee attorney make those rights self-enforcing.

Under questioning, she acknowledged that she knew that Buyers had breached the contract after the one year period for installing the water line had passed, but she stated that she had forgotten about the reversionary clause, and she denied that she had any intention of waiving her remedy under the contract. She explained, however, that she decided to bring suit when she did because it did not appear likely that Buyers would ever manage to install

-4-

the agreed-upon waterline and she wanted to avoid the bar of the six year statute of limitations on contract actions in Tennessee.

Buyers offered the testimony of a civil engineer and a surveyor who had worked with them on the plans for development of the property. The civil engineer, who had served as a consultant for the Wilson County Water and Wastewater Authority, testified that the city would not grant Buyers a permit for the water line until the sewer line was installed, and that because of the distance to the nearest existing sewer line, they would have to obtain numerous private easements to reach their property. Multiple approvals from the City of Lebanon and the State of Tennessee were also required.

The surveyor testified that he had worked with Gordon Bone for over thirty years, and that Mr. Bone was a very experienced and successful developer. Among the projects the surveyor worked on for Mr. Bone were a subdivision development of 30 or 40 lots, several of 50 or 60 lots each, and one of 100 lots. When Mr. Bone took the stand, he confirmed the surveyor's testimony as to his history as a developer, but he testified that he had never before experienced as complicated and convoluted a process as was involved in the development of the property at issue. He testified that he and his partner spent over $90,000 on design, engineering, testing, permits and applications in their efforts to develop the property.

Mr. Bone testified that he had several conversations with Seller about the progress of his development plans, including one discussion about the sewer requirement, but that she never mentioned the reversionary clause during those discussions. He also testified that he himself was unaware of the possibility of reverter because he had never read the contract of sale. He further declared that he never would have bought the property if he had known about the sewer requirement. He acknowledged under questioning, however, that he now knows that if he had divided the property into lots of five acres or more, he would have been able to bring a waterline across the property without requiring the approval of the Lebanon Planning Commission.

Mr. Bone also acknowledged that Buyers rented out the Rock House even before the contract of sale was executed and that they collected rent for it from then on, paying the taxes and insurance every year. The house was occupied by a tenant at the time of the hearing. Seller informed the court that the tenant had refused entry to her so she could not inspect the house to determine whether it had sustained any damages since the reversion.

At the conclusion of the proof, the trial court announced its decision from the bench. The court rejected Buyers' defenses of waiver, laches and impossibility of performance. It restated its earlier judgment that the contract and the deed created a fee simple determinable estate, and it declared that the Rock House had reverted to Seller by operation of law on

September 30, 2004, without any requirement of notice or re-entry on her part. Because the seller did not have the opportunity to inspect the Rock House, the court took the issue of damages under advisement.

### III. THE HEARING ON DAMAGES

The tenant in the Rock House subsequently allowed Ms. Lasater to inspect the premises and to take photographs. After observing extensive damage and deterioration, Seller informed the tenant that she would have to vacate the house or legal action would be brought against her. The hearing on damages was conducted on February 26, 2010.

Ms. Lasater testified that she herself rented the house out to tenants after 1989, that she chose her tenants carefully, that she arranged for repairs to be made as needed, and that she and other family members came up to Tennessee to clean the house when tenants moved out. She was cleaning the house when Mr. Hawkins first made contract with her to ask if she was interested in selling her property. She testified that the house was in good condition in 2003, but that she saw obvious and extensive damage when she inspected it in 2009.

A mold remediation expert and an insurance adjuster also inspected the house prior to the hearing, and both testified. Their testimony, and over 175 photographs that were made part of the record, showed defects in the house which included, among other things, broken windows and screens, vines growing into the house through an empty window frame, a front door that was broken in two as if by a forced entry, six inches of standing water in the basement, and a leaking pipe under the kitchen sink. The kitchen floor was spongy, and there was visible mold under the sink and around a bathtub that had sunk a few inches into the floor. The gutters were clogged and the down spouts were pulled away from the exterior wall, so water drained directly onto the foundation.

The mold remediation expert testified that the type of mold found in the house was dangerous to human health, and he described in detail the processes necessary to safely eliminate the mold, including removing and discarding infected sheetrock and wood paneling and even some structural elements that had been weakened by the mold.[2] He testified that the house was not habitable in its current condition without adverse health effects and that the mold he observed had developed within the past one or two years. The insurance adjuster testified in detail as to other elements of damage to the house, including deep scratches on original wooden paneling that appeared to have been caused by dogs. He entered a detailed estimate of the cost of repairs, minus an allowance for depreciation that had likely occurred

---

[2]A lab report indicated that the mold in the house included a species called black mold or stachybotris, the spores of which are extremely toxic.

before the most recent damage. His estimate totaled $67,767.

When Kenneth Hawkins took the stand, he testified that the Rock House was in poor condition at the time Buyers took possession of it. He asserted that in order to improve it, he graveled the driveway, installed a central heat and air conditioning system, replaced some windows and repaired the roof. He further testified that in July of 2007 when the last tenants moved into the house, it was in good condition. He acknowledged that one of the people living in the house was breeding dogs on the property, but he asserted that this did not violate the conditions of the lease, so long as the dogs were not allowed in the house. Ms. Lasater was called once again as a rebuttal witness, and she contradicted some of Mr. Hawkins' contentions as to defects in the house in 2003.

Ms. Lasater and Mr. Hawkins were both asked for their estimates of the value of the Rock House on September 30, 2003, the date of the sale of the property. Those estimates differed widely, with Seller testifying that it was worth $150,000, and Mr. Hawkins testifying that it was worth between $50,000 and $55,000. Mr. Hawkins also testified that he had taken out $60,000 in insurance on the property. Seller was also to asked estimate the value of the Rock House after she inspected it in October of 2009. She testified that she believed it was worth only $20,000, because of the extensive damage caused by the tenant. We will discuss the valuation testimony more fully later in this opinion.

At the conclusion of proof the trial court took the matter under advisement. He rendered his decision in a memorandum filed on March 25, 2010, which was memorialized in a final order, filed on April 20, 2010. The court ruled that Seller was entitled to lost profits from rents, from September 30, 2004 to the present, amounting to $24,595 after a 20% management fee and other expenses were deducted from the total rental income on the house. The court also found that the Rock House had a value of $60,000 on September 30, 2003, but that because of waste by the tenants and neglect by Buyers, it had depreciated in value by $58,000 by the time of trial, and it awarded that amount as damages to Seller. Other major components of the damage award were attorney fees of $50,168, and discretionary expenses of $6,064. Together with prejudgment interest and some other less significant damages, the total amount of the court's judgment was $142,424.65.

Buyers filed a motion for new trial under Tenn. R. App. P. 59.02. The motion asserted for the first time that the contract of sale created a fee simple subject to a condition subsequent and, thus, that Seller's reversionary right to possession was not triggered until she filed her notice of reverter on August 7, 2008, and that Buyers were therefore not liable for any damages incurred prior to that date. For her part, Seller filed a motion to alter or amend, asking the trial court to correct its earlier order by finding that the value of the Rock House on September 30, 2004, was $60,000, the same as it had been on September 30, 2003. The

trial court denied the motion for new trial in an order filed on June 9, 2010, but granted Seller's motion to alter or amend, thereby leaving the judgment for damages to the Rock House unchanged. This appeal followed.

## IV. LACHES AND WAIVER

This court reviews findings of fact *de novo* on appeal, according those findings a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Blair v. Brownson*, 197 S.W.3d 681, 684 (Tenn. 2006). We review questions of law *de novo* with no presumption of correctness. *Whaley v. Perkins*, 197 S.W.3d 665, 670 (Tenn. 2006). Buyers argue on appeal that because Seller failed to assert her right of reversion for four years after their failure to install a waterline triggered that right, she is now entirely precluded from exercising that right, under the theories of waiver or laches.[3]

Buyers argue that under either theory, the trial court erred by allowing Seller to retake possession of the Rock House. Under our standard of review, the trial court's determination of the facts upon which the allegations of waiver or laches are premised is entitled to a presumption of correctness, while its conclusion that those facts do not support the application of either of those equitable defenses is not entitled to any such presumption.

A waiver is a voluntary relinquishment or renunciation of a known right. *Chattem, Inc. v. Provident Life & Acc. Ins. Co.*, 676 S.W.2d 953, 955 (Tenn. 1984); *Tarpley v. Hornyak*, 174 S.W.3d 736, 751 (Tenn. Ct. App. 2004) (citing *Baird v. Fidelity-Phenix Fire Ins. Co.*, 162 S.W.2d 384 (Tenn. 1942)). The law will not presume a waiver, and the party claiming the waiver has the burden of proving it by a preponderance of the evidence. *Jenkins Subway, Inc. v. Jones,* 990 S.W.2d 713, 722 (Tenn. Ct. App. 1998).

"Waiver may be proved by 'express declaration; or by acts and declarations manifesting an intent and purpose not to claim the supposed advantage; or by a course of acts and conduct, or by so neglecting and failing to act, as to induce a belief that it was [the party's] intention and purpose to waive.'" *Jenkins Subway, Inc. v. Jones,* 990 S.W.2d at 722 (quoting *Baird v. Fidelity-Phenix Fire Ins. Co.*, 162 S.W.2d at 389).

It is undisputed that Seller never expressly declared that she intended to waive her reversionary rights to the Rock House. Buyers' theory is premised on occasional discussions between them and Seller in the years leading up to the present suit. The matters discussed included an agreement to let Buyers cut hay on Seller's remaining acreage and Buyers' plan to create a drainage ditch to allow water to flow from their property to hers. During the

---

[3]Buyers have apparently abandoned their defense of impossibility.

course of those discussions, Seller would sometimes ask about the progress of Buyers' development plans, but she never mentioned the reversion. Buyers suggest that her conduct amounted to an implied waiver of her right to the reversion. Seller testified, however, that she never had any intent to waive her right of reverter, and we find nothing in her conduct to support a belief that she intended to waive it.

Buyers rely upon the same failure by Seller to timely assert her rights to support their theory of laches. Laches, unlike waiver, does not depend on the intent of the party against whom it is asserted. A judgment based on laches "is predicated on the trial court's finding of inexcusable, negligent, or unreasonable delay on the party asserting the claim which results in prejudice to the defending party. It is an equitable defense which requires the finder of fact to determine whether it would be inequitable or unjust to enforce the claimant's rights." *Finova Capital Corp. v. Regel,* 195 S.W.3d 656, 660 (Tenn. Ct. App. 2005) (citing *Gleason v. Gleason*, 164 S.W.3d 588, 592 (Tenn. Ct. App. 2004)).

The defense of laches is based on the principle that "equity will not intervene on behalf of one who has delayed unreasonably in pursuing his rights." *Hannewald v. Fairfield Communities, Inc.*, 651 S.W.2d 222, 228 (Tenn. Ct. App. 1983). "Laches, however, requires more than mere delay. It requires an unreasonable delay that prejudices the party seeking to employ laches as a defense, and it depends on the facts and circumstances of each individual case." *Id.* (citing *Brister v. Estate of Brubaker,* 336 S.W.2d 326, 332 (Tenn. Ct. App. (1960)).

Buyers insist that they were prejudiced by Seller's delay in enforcing her rights because in the interim, "the Defendants continued to develop the property, lease the Rock House, and to collect and expend rents, and the tenants in the Rock House committed waste to the property." It is at least arguable that if Seller had attempted to retake possession of the Rock House earlier, Buyers would have abandoned their plans rather than continuing to invest in the possibility that they could create a profitable subdivision on the property they had purchased. However, there was no proof that any part of the investment they made was directed specifically towards the Rock House, other than the costs they incurred as landlords on the house. It is difficult to see how they were prejudiced by collecting rents, or why Seller should be made responsible for damages caused by Buyer's choice of tenant.

Our courts have stated many times that the application of laches lies within the discretion of the trial court and is reviewed on appeal under an abuse of discretion standard. *John P. Saad & Sons, Inc. v. Nashville Thermal Transfer Corp.,* 715 S.W.2d 41, 46 (Tenn. 1986); *In re Estate of Baker v. King*, 207 S.W.3d 254, 264 (Tenn. Ct. App. 2006); *Finova Capital Corp. v. Regel*, 195 S.W.3d 656, 660 (Tenn. Ct. App. 2005); *Dennis Joslin Co., LLC*

*v. Johnson*, 138 S.W.3d 197, 199 (Tenn. Ct. App. 2003); *Brown v. Ogle*, 46 S.W.3d 721, 727 (Tenn. Ct. App. 2000). The trial court did not abuse its discretion under the circumstances of this case by ruling that Buyers are not entitled to the benefit of the equitable doctrine of laches.

## V. THE NATURE OF THE REVERSIONARY RIGHT

Buyers argue that even if Seller is entitled to retake possession of the Rock House, the trial court erred in its characterization of the reversionary right created by the contract of sale. Their theory is that the contract of sale created a fee simple subject to a condition subsequent, which would imply that the reversionary right did not automatically vest a year after the contract was executed, but only after Seller filed her Notice of Automatic Reverter of Title. If that were so, the amount of damages Seller was entitled to would be considerably reduced.

We must note at the outset that there is no indication in the record that Buyers raised this argument prior to filing their Rule 59.02 motion for new trial. As our Supreme Court stated in *Serv-U-Mart v. Sullivan County,* 527 S.W.2d 121, 124 (Tenn. 1975), "It is well-settled in this state that a party cannot raise a new issue, or present a new line of proof, on motion for a new trial, that was not within the scope of the pleadings and was not presented to the court at the trial of the case." *See, also, Bradley v. McLeod*, 984 S.W.2d 929 (Tenn. Ct. App. 1998)(holding that the same principle applies when party files a Rule 59.04 motion to alter or amend). However, the Buyers' new argument is just that: an argument as to the legal effect of the language. It is not an attempt to change its factual allegations. Whether or not this court could properly decline to consider the Buyers' new legal argument, in the interest of thoroughness, we will briefly discuss the argument they present.

The nature of the estate created by the contract of sale and the warranty deed is a question of law, which is reviewed *de novo* with no presumption of correctness. *Whaley v. Perkins*, 197 S.W.3d 665, 670 (Tenn. 2006); *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 887 (Tenn. 2002). The cardinal rule for construing contracts is to ascertain the intention of the parties and to give effect to that intention consistent with legal principles. *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975); *Walker v. Tennessee Farmers Mut. Ins. Co.*, 568 S.W.2d 103, 105 (Tenn. Ct. App. 1977). We ascertain the parties' intent based on the natural and ordinary meaning of the contractual language. *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999); *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth Inc.*, 521 S.W.2d at 580.

Where the language of the contract is clear and unambiguous, its literal meaning controls the outcome of contract disputes. *Planters Gin Co. v. Fed. Compress & Warehouse*

*Co., Inc.*, 78 S.W.3d at 890; *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth Inc.*, 521 S.W.2d at 580. Where ambiguity exists in a contract, parol evidence may be considered to guide the court in construing and enforcing the contract. *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 612 (Tenn. 2006); *Jones v. Brooks*, 696 S.W.2d 885, 886 (Tenn. 1985).

The contract of sale and the deed in this case both refer to an automatic reversion of the Rock House to Seller in the event that Buyers fail to install a waterline within one year of the execution of the contract. The word "automatic" signifies that no external influence or control is required to accomplish some desired result. *See* the American Heritage Dictionary of the English Language, 90-91 (New York 1970). It would be logical to conclude that an automatic reversion is one that does not require any particular action on the part of the holder of the reversionary interest to create or activate her rights to the property.

If the words "automatic" and "automatically" were omitted from the contract of sale, the contract language would be just as effective in creating the possibility of a reversion, but Buyers could more convincingly argue that Seller would have to take some positive action to make the reversion happen.

The contract language in this case and the parties' arguments must be understood within the context of two similar but not identical types of future reversionary interests, which are described succinctly in *Williamson v. Grizzard,* 387 S.W.2d 807 (Tenn. 1965).

> The only distinction between the two future interests is, in a determinable fee, upon the happening of the condition, the grantee's estate automatically terminates and the entire fee simple title reverts to the grantees or their heirs. If the estate created is a fee simple on a condition subsequent, some act of re-entry on the part of the grantors or their heirs is necessary upon the happening of the condition, to re-vest title in the grantors or their heirs.

*Id.* at 809 (citing *Atkins v. Gillespie*, 299 S.W. 776 (Tenn. 1927)).

To support their argument that the contract of sale in this case created a fee simple subject to a condition subsequent, buyers rely heavily on the case of *East Tennessee and Western North Carolina Railroad Co. v. Gouge,* 203 S.W.2d 170 (Tenn. Ct. App. 1947). In that case, the owners of tract of land brought suit against the railroad company for damage to their land resulting from the railroad's operation of a right of way across the property. The parties entered into evidence a deed to the right of way executed in 1875 by the owners' predecessors in interest. The deed provided that unless the railroad company built a rail line within two years of the execution of the deed, "this conveyance is to be a nullity." *Gouge,* 203 S.W.2d at 171.

-11-

The railroad was not built until 1881. The owners brought suit in 1945. The trial court ruled that the language "this conveyance is to be a nullity" was not self-executing and that "[t]he language in the deed clearly creates a condition subsequent." Since the grantors and their successors in interest did not take any action to assert their right to the property under dispute for over sixty years, the reversionary interest never became effective. The court did not explain exactly why it believed the deed language created a condition subsequent, rather than a "conditional limitation," as it called the future estate which we term "a fee simple determinable." In any case, the contract and deed in the present case do not use the same deed language that the court interpreted in *Gouge*, and the facts of the two cases also differ significantly.

Buyers also argue that the condition set out in the contract of sale differs from most cases involving a fee simple determinable because those cases usually condition any reversion on the cessation of an existing activity on the property rather than the non-occurrence of some future event. For example, in *Mountain City Missionary Baptist Church v. Wagner*, 249 S.W.2d 875, 876 (Tenn. 1952), the deed at issue provided that the property would revert to the grantors "if said property shall cease to be used by the said Missionary Baptist Church (for any reasonable period of time) as a place of worship." In *Griffis v. Davidson County Metro. Gov't,* 164 S.W.3d 267, 274 (Tenn. 2005) a deed conveyed property to the Davidson County Board of Education which required that the property be used "for school purposes" and that it be "devoted exclusively to the cause of education," with reversion to the grantors should the property cease being used for those purposes.

Buyers also point to the case of *Yarbrough v. Yarbrough*, 269 S.W. 36 (Tenn. 1925), in which the court described determinable fees in similar terms: "Old examples of determinable fees are limitations to one and his heirs 'as long as the Church of St. Paul shall stand,' 'until the grantee go to Rome,' the most appropriate words to create a determinable fee being, during, so long as, till, until, whilst, etc., such words fitly prefacing a limitation." *Yarbrough v. Yarbrough*, 269 S.W. at 38. Buyers suggest that because of the nature of the event triggering the reversion in the present case, the contract of sale and deed do not contain such words and, therefore, they cannot have created a fee simple determinable.

While we have been unable to find a Tennessee case in which a fee simple determinable was created under circumstances similar to the ones before us, we note that a fee simple determinable has been defined in terms broader and more inclusive than those insisted upon by Buyers: "A fee simple determinable is a fee simple created to continue until its automatic expiration on the happening of a stated event. . . The stated event can be either the happening or the **non-happening** of a stated occurrence, and can be either certain or not certain to happen." 28 AM.JUR.2D *Estates* § 26 (2000) (emphasis added). Additionally,

An estate in fee simple determinable is created by any limitation which, in an otherwise effective conveyance or devise of land creates an estate in fee simple and provides that the **estate shall automatically occur upon the stated event**. A fee simple determinable and the **possibility of reverter** that accompanies it are both interests that **vest immediately** upon their creation. While no particular words are required to create a fee simple determinable, it is necessary that language be used which shows that the estate will automatically expire on the occurrence of a certain event.

28 AM.JUR.2D *Estates* § 32 (2000) (emphasis added). *See, also, Powell v. Sumner County Bd. of Education*, 01-A-01-9005-CH-00190, 1990 WL 170446 at *2 (Tenn. Ct. App. Nov. 7, 1990)(declaring that "an estate in fee simple determinable is created by any limitation which, in an otherwise effective conveyance or device of land, (1) creates an estate in fee simple and (2) provides that the estate shall automatically expire upon the occurrence of the stated event").

In sum, the trial court correctly held that by providing that the Rock House would **automatically** revert to Seller in the event that the waterline was not installed as promised, the contract of sale and the warranty deed created a fee simple determinable rather than a fee simple subject to a condition subsequent, and Seller was entitled to damages dating from September 30, 2004, when ownership of the Rock House reverted to her by operation of law.

## VI. THE AWARD OF DAMAGES

The court's Memorandum of March 25, 2010 recited that Seller had testified that at the time of the sale of the property the value of the Rock House was $150,000 and that in its damaged condition at the time of trial, its value was only $2,000. Rather than rely on Seller's estimate of the value of the house in 2003, the court turned to other evidence in the record. The court noted that Kenneth Hawkins had testified to a value between $50,000 and $55,000 for the house and that he had insured it for $60,000 at the time of purchase. The court concluded that the fair market value of the Rock House in October 2003 was $60,000 and its fair market value in October 2009 was $2,000. Using those two figures, the court concluded that the reduction in the value of the house was $58,000 and it assessed that amount as damages against Buyers, repeating that amount in its order of April 20, 2010.

The certified transcript of the proceedings shows an error in the court's recitation, however, for the Seller had actually testified that the value of the house at the time of trial was $20,000. In the following excerpt from that transcript, Seller is being questioned by her own attorney, Ms. Perutelli:

-13-

Q. In your opinion, what would the house have been worth in 2003 in the condition it is in today?

A. If it were in the condition it is today in 2003?

Q. I want you to tell me an amount, please ma'am.

MR. HENDERSON: Objection, again speculative, Judge.

THE WITNESS: 20,000.

THE COURT: Okay. Overruled.

THE WITNESS: The house only; I'm not talking the land.

MS. PERUTELLI: $20,000. I have no further questions, your honor.

We have found no evidence in the record that Seller or anyone else testified that the current value of the house was only $2,000. Seller argues that in light of her testimony as to the value of the house in 2003, there was a sufficient basis in the record for the court to find that the reduction in its value was even greater than $58,000, and she notes that the defendants themselves referred to the $2,000 figure in their motion for new trial.

But while there is no evidence in the record to support a figure of $2,000 for the value of the house in 2009, there is evidence to support a figure of $60,000 for the value of the house in 2003. It thus appears to us that the trial court simply made a mistake, perhaps in the process of writing or transcribing its notes. We cannot sustain such a mistake on appeal.[4] We therefore find that there was an $18,000 error in the court's calculation of damages, and we accordingly reduce the judgment against Buyers by that amount to reflect the true state of the evidence.

---

[4]Seller's attorney asserted during oral argument that the trial court's order accurately reflected Seller's testimony that the property was only worth $2,000, and that the figure of $20,000 was a misprint. Interestingly, the transcript showed that earlier in her testimony, Seller testified that the house was worth $30,000 in October 2009. The court reporter who transcribed the proceedings certified to the truth and accuracy of the transcript, and Seller did not challenge its accuracy prior to oral argument in this case. The record on appeal includes a stipulation by all parties, agreeing to two corrections to the transcript of the October 14, 2009 hearing, but there is no evidence in the record of any attempt to correct the transcript of the hearing at which the valuation testimony was heard.

## VII.

The judgment of the trial court affirmed as to the nature of the future interest retained by the Seller in this case, but we modify the award of damages to reduce it by $18,000. This case is remanded to the Circuit Court of Wilson County for any further proceedings necessary. Tax two-thirds of the costs on appeal to the appellants and one-third to the appellee.

_____

PATRICIA J. COTTRELL, JUDGE